596 S.E.2d 505

**Michael M. PIRAYESH, Respondent/Appellant,**

v.

**Mary Alice PIRAYESH, Appellant/Respondent.**

**No. 3793.**

Court of Appeals of South Carolina.

Heard March 10, 2004.

Decided May 11, 2004.

J. Falkner Wilkes, of Greenville, for Appellant–Respondent.

Bobby H. Mann, of Greenville, for Respondent–Appellant.

HEARN, C.J.:

Michael M. Pirayesh (Husband) and Mary Alice Pirayesh (Wife) were granted a divorce on the ground of one year's continuous separation without cohabitation. Husband was granted custody of the parties' two children, but was prohibited from traveling with the children outside the United States. Wife was granted visitation rights and was ordered to pay child support. The parties were ordered to split the guardian ad litem fees and pay their own attorney's fees. Both parties appeal this order. We affirm in part, reverse in part, and remand.

## FACTS

Husband, who was born in Iran, moved to the United States in 1978 and has since become a United States citizen. On June 11, 1984, he and Wife married. The parties had two children during their marriage, a son, now fifteen years old, and a daughter, now thirteen years old. Although Wife and children have always lived together in Greenville, South Carolina, Husband worked for six months in Portland, Oregon in 1996 and thereafter in Atlanta, Georgia until 1998. At the time of the divorce hearing in March 2001, Husband had obtained a job in Charlotte, North Carolina, and had been living there for approximately one year. The children resided with Wife during the couple's one year's separation as well as during the pendency of this litigation.

Husband claims the marital breakdown was a result of Wife's inability to handle the family finances and the accrual

of a large amount of credit card debt. When asked if he and Wife tried to budget their money, Husband testified:

> Yes, we did.... Like for example, we said we don't have ... certain money to spend on certain things.... [W]e said, if you are going to make a long distance phone call let's just keep it under a hundred dollars.... She did not follow that. As a matter of fact, I have one conversation that she had with her mom for a hundred and twenty minutes. My ear get[s] hurt after fifteen (15) minutes.... Grocer[ies] for example, you know. We bought grocer[ies]; that's fine. Half of the grocery throw away (sic). Either she burned it cooking or she didn't like to eat left over food.

Husband also testified that Wife had been un- or under-employed for much of the marriage despite the fact that she has always been in good health.

Wife contended that the failure of the marriage was largely a consequence of Husband's emotional and physical distance from her and the children, due namely to his out of town employment and his preoccupation with playing tennis. According to Wife, the couple's problems began when, on the day of their daughter's birth, Wife called Husband to inform him that their newborn had to be monitored because she had stopped breathing. Wife testified as follows:

> [T]hat evening I had fed Debra, she stopped breathing. And I tried to wake her up. And nothing was happening.... And I rang the nurse's station from the bed.... They came and they got her to start breathing again. I called [Husband and] told him what had happened.... It was probably 10 o'clock when I called back. And his response was, "[Wife], I was asleep." And he hung up.

Wife testified that Husband's response to their daughter's health problems made her "wonder[ ] what kind of man [she] had married" and that their marital problems only increased from then on.

Both parties sought custody of their two minor children. During the presentation of Husband's case, Husband and three witnesses testified on his behalf. The witnesses, all of whom knew Husband through his tennis hobby, testified that *both* Husband and Wife were loving parents. Husband testified that his primary reason for seeking custody was because,

during the pendency of the litigation, the water in the Wife's home was cut off twice, the phone was disconnected five times, and the electricity was also turned off. He also complained that Wife was late dropping the children off to visit with him a number of times and that Wife did not effectively discipline the children while they were in her care. Husband felt he was the better parent because he had a flexible job that paid $60,000 a year, he knew how to budget his money, and he could control the children.

During the presentation of Wife's case, seven witnesses testified that Wife was a good parent.[1] One of those witnesses was a neighbor who has lived next door to the couple for six years. The neighbor testified that he and his wife had to care for Wife after she had a hysterectomy because Husband was in Atlanta during the week and playing tennis on the weekend.[2] The neighbor also testified that Husband seemed volatile with the children. Another witness testified that she helped Wife with her daughter's birthday party, and at the party, Husband complained to the witness about Wife. The witness testified that Husband seemed "very alienated and angry."

Wife testified that, in addition to having primary custody of the children during the couple's separation, she had been the primary caretaker for the children during the marriage. In addition to Husband working out of state for two-and-a-half years, she claimed Husband played tennis five days a week, no matter what was going on in their children's lives.[3] She also testified that Husband gets agitated easily and that he was always critical of her and the children.

---

1. Two of Wife's witnesses testified that Husband was a fine parent as well.

2. After Husband testified on direct that Wife had no health problems, he was specifically asked on cross-examination about Wife's hysterectomy. Husband claimed he did not know she had one. Wife testified she had a hysterectomy in December of 1997, before the parties separated. Husband then returned to the stand on reply, recalled the hysterectomy, and claimed he took nine days off from work in order to care for her and the children.

3. During Husband's cross-examination, he admitted playing tennis every other day during the marriage.

Wife testified that she has worked during most of the marriage and that the periods during which she was unemployed occurred when the children were newborns or when they were ill.[4] While she admitted that she had trouble paying the utilities during the parties' separation, she pointed out that she and Husband were having trouble paying their bills while they were a two-income family and that those problems were amplified during the separation. She further explained that she missed several days of work during the parties' separation when she severely burned her leg from her knee to her hip, which put a further strain on her finances.

On cross-examination, Wife was asked about counseling appointments the children had missed.[5] Wife explained that the December visit was rescheduled because the counselor was on vacation. Wife testified that she rescheduled the next visit because she was working with a woman who was nine-and-a-half months pregnant, and Wife felt she could not leave the woman alone. On the third attempted visit, Wife and children went to the office, but when they arrived, they found out that the fee had increased from ten to fifteen dollars; when Wife did not have the extra money, she was told she would have to reschedule. On the fourth attempt at rescheduling, the brakes on Wife's car went out on the way to the appointment.

Wife was also asked about why the parties' daughter had not had a psychological evaluation, as previously ordered by the family court, and why the daughter had missed three dentist appointments. Wife explained that she could not afford the psychological evaluation and Husband would not help her pay for it because he did not agree that the daughter needed to be evaluated. As for the missed dentist appointments, Wife claimed daughter had been ill.

In addition to custody of the children, another major issue was whether or not Husband would be allowed to travel with the children to Iran. When questioned about his desire to bring the children to Iran, Husband explained he wanted his

---

4. The parties' son had ear problems when he was little and now cannot hear out of his right ear. Their daughter was born with three kidneys.

5. The children had seen the counselor regularly from June 2000 to November 2000; however, at the time of the divorce hearing, they had not been to a session in four months.

children to visit his parents and other Iranian relatives.[6] However, he stressed that he had no desire to relocate to Iran and said he wanted Wife to remain a major part of their children's lives.

According to Wife, Husband threatened on more than one occasion to move back to Iran and take the children with him. Wife offered the testimony of Christine Uhlman to show the inherent risks to children in travel to Iran, the specific risks of parent/child abduction in similar situations, and the lack of any legal remedy should this occur. Due to her extensive experience in this area, Uhlman was qualified by the court as an expert witness on child abduction in the Middle East and the remedies that might be available for people who find themselves in that predicament. The court found, however, that she did not have an adequate education or background to be qualified as an expert on the law of Iran, and limited her qualification to the topics listed above.

The family court also heard the guardian ad litem's final report concerning Husband's travel outside of the United States and custody of the two children. The guardian testified that she believed Wife's fears that Husband would abduct and relocate the children were baseless, but acknowledged that travel restrictions may nevertheless be warranted. She also testified to some psychological, social, and physical problems of both the children and her perception that these problems were not being adequately addressed. The guardian was also troubled by Wife's apparent inability to meet the basic health and day-to-day living needs of the children. In her opinion, Husband appeared to be in a better position to meet these needs and it was therefore in the best interests of the children to grant him custody. The guardian made this recommendation to the court.

The family court followed the guardian's custody recommendation, granting Husband custody of both children and granting Wife standard visitation rights. The family court also prohibited Husband from taking the children out of the United States. The parties were ordered to pay for their own

---

6. Husband's father is ninety-one years old; thus, travel by him to America is not feasible.

attorney's fees, and the cost of the guardian was split between them. Both parties appeal this order.

## ISSUES ON APPEAL

I.    Was the guardian's recommendation the product of an independent, balanced, and impartial investigation?

II.   Did the family court err in its reliance on the guardian's recommendation in determining custody of the children?

III.  Did the family court err by requiring each party to pay half of the guardian ad litem's fees?

IV.  Did the family court err by ordering the parties to pay their own attorney's fees and costs?

V.    Did the family court err by restricting Husband from traveling outside of the United States with the children?

VI.  Did the family court err in the apportionment of the marital debt?

## STANDARD OF REVIEW

On appeal from the family court, this court has jurisdiction to find the facts in accordance with its own view of the preponderance of the evidence. *Murdock v. Murdock,* 338 S.C. 322, 328, 526 S.E.2d 241, 244–45 (Ct.App.1999). This court, however, is not required to disregard the family court's findings; nor should we ignore the fact that the family court judge, who saw and heard the witnesses, was in a better position to evaluate their testimony. *Badeaux v. Davis,* 337 S.C. 195, 202, 522 S.E.2d 835, 838 (Ct.App.1999); *Smith v. Smith,* 327 S.C. 448, 453, 486 S.E.2d 516, 519 (Ct.App.1997). Because the appellate court lacks the opportunity for direct observation of witnesses, it should give great deference to the family court's findings where matters of credibility are involved. *Kisling v. Allison,* 343 S.C. 674, 678, 541 S.E.2d 273, 275 (Ct.App.2001); *Dorchester County Dep't of Soc. Servs. v. Miller,* 324 S.C. 445, 452, 477 S.E.2d 476, 480 (Ct.App.1996). This is especially true in cases involving the welfare and best interests of children. *Id.; see also Cook v. Cobb,* 271 S.C. 136, 140, 245 S.E.2d 612, 614 (1978) (stating that the welfare and best interests of children are the primary, paramount, and

controlling considerations of the court in all child custody controversies).

## LAW / ANALYSIS

Wife challenges the custody order by arguing: (1) that the guardian's recommendation to the court was a product of an incomplete and biased investigation; and (2) that the family court improperly relied on the guardian's recommendation. We agree.

### I. Was the guardian's recommendation the product of an independent, balanced, and impartial investigation?

In *Patel v. Patel*, 347 S.C. 281, 555 S.E.2d 386 (2001), the Supreme Court of South Carolina set the base line standards for the responsibilities and duties of a guardian ad litem. Foremost in the court's list of duties, the guardian shall:

... conduct an **independent, balanced, and impartial** investigation to determine the facts relevant to the situation of the child and the family, which should include: reviewing relevant documents; meeting with and observing the child in the home setting and considering the child's wishes, if appropriate; and interviewing parents, caregivers, and others with knowledge relevant to the case.

*Id.* at 288, 555 S.E.2d at 390 (emphasis in original); *see also* South Carolina Private Guardian Ad Litem Reform Act, S.C.Code Ann. § 20-7-1549 (Supp.2003) (codifying the *Patel* guidelines with more specificity, but only directly applicable to guardians ad litem appointed after January 15, 2003).

In *Patel*, the guardian's investigation reflected overwhelmingly favorable treatment toward the husband and negligible consideration of the wife's capacity to competently parent the children. For example, the guardian contacted the husband's attorney nineteen times, but failed to contact the wife's counsel once. The guardian had frequent contact with the husband but minimal contact with the wife, and the guardian only met with the children when they were with the husband. The guardian even secretly listened in on phone conversations between husband and wife while visiting with the husband. *Id.* at 286, 555 S.E.2d at 388–89. The *Patel* court held that the actions and inactions of the guardian so tainted the

decision of the family court that the wife was not afforded due process, and the court remanded the issue of custody to the family court. *Id.* at 286–87, 291, 555 S.E.2d at 389, 391.

We recognize that the case at hand is different from *Patel* in that Wife's argument stems, not from the guardian's incomplete investigation of her, but rather from the guardian's allegedly superficial investigation of Husband's parenting abilities. However, we believe the requirements set forth in *Patel* were meant not only to protect the parents who are the subjects of the guardian's investigation but also to ensure that the fate of a child's living arrangements does not rest in the hands of a guardian whose investigation is biased or otherwise incomplete. Thus, a parent, whether the focus of the guardian's investigation or largely ignored by the investigation, may appeal a custody decision if that parent believes the family court's order was tainted by the guardian's improper investigation.

Here, the guardian visited Wife's home several times to interview her and the children. However, there is no indication that she ever interviewed Husband and the children while they visited his home in Charlotte. Instead, she testified she met with him and the children at a McDonald's restaurant one time. She further testified that she went to Charlotte to view Husband's residence and the schools the children would attend if custody was changed and talked on one occasion to a college student who babysat the children during their two-week summer visitation with Husband.

The guardian testified that her recommendation was largely based upon the concerns of the children's counselor regarding counseling appointments they had missed and a psychological evaluation that had still not been scheduled for the parties' daughter. Apparently, the guardian blamed Wife for the missed appointments and did not believe Husband had any responsibility to make sure these appointments were made. However, the record indicates that the counselor had sent a letter to both Husband and Wife about the missed counseling sessions. Furthermore, where Wife at least attempted to schedule a psychological evaluation, there was no evidence that Husband did anything to ensure that the evaluation was completed. On cross-examination, the guardian was asked:

Q: [Y]ou have concerns too about the father . . . as far as your investigations?

A: Right

Q: But your concerns aren't listed necessarily on your report because you didn't mention them in your report that you had concerns that the father had not complied with the psychological evaluation for [the daughter], and not attended counseling, and not attended co-parenting counseling, and has also exposed the children as far as to more—that both parents have exposed the children to the divorce related issues. So those aren't reflected on your report on the second page that I was able to see?

A: Right

When asked whether she wanted to explain why she had not mentioned Husband's shortcomings in her report, the guardian merely stated that she did not omit them for any particular reason and again pointed out that the children spent more time with Wife.

Additionally, the record indicates that the guardian was mistaken about some of the facts she reported to the family court. For instance, the guardian testified that the parties' daughter had nine absences from school, which contradicted Wife's testimony. However, at the hearing for reconsideration, the school verified Wife's assertion that daughter had five absences. While this mistake by the guardian appeared to be inadvertent, the guardian was adamant during her testimony that the daughter had four additional unexcused absences.[7] Thus, the guardian's recommendation was at least partially biased because of her mistaken belief that the daughter had several unexcused absences while in Wife's care.

Based on the guardian's superficial investigation of Husband, her failure to hold Husband partially responsible for the children not attending counseling, and her over-reporting the number of absences daughter has had at school, we agree with

---

**7.** In fact, the daughter did not have any unexcused absences. When questioning the guardian, Wife's attorney attempted to explain that the lower case "u's" on the daughter's attendance record denoted a tardy; however, the guardian stated: "Your eyes might be better than mine. I can't—I just see it as a U."

Wife that the guardian's recommendation did not result from a fair and impartial investigation.

**II. Did the family court err in its reliance on the guardian's recommendation in determining custody of the children?**

In determining the best interest of the child in a custody dispute, the family court should consider several factors, including: who has been the primary caretaker; the conduct, attributes, and fitness of the parents; the opinions of third parties (including the guardian, expert witnesses, and the children); and the age, health, and sex of the children. *Patel,* 347 S.C. at 285, 555 S.E.2d at 388. Rather than merely adopting the recommendation of the guardian, the court, by its own review of all the evidence, should consider the character, fitness, attitude, and inclinations on the part of each parent as they impact the child as well as all psychological, physical, environmental, spiritual, educational, medical, family, emotional and recreational aspects of the child's life. *See Woodall v. Woodall,* 322 S.C. 7, 11, 471 S.E.2d 154, 157 (1996); *Epperly v. Epperly,* 312 S.C. 411, 415, 440 S.E.2d 884, 886 (1994); *Wheeler v. Gill,* 307 S.C. 94, 99, 413 S.E.2d 860, 863 (Ct.App.1992). When determining to whom custody shall be awarded, the court should consider all the circumstances of the particular case and all relevant factors must be taken into consideration. *Woodall,* 322 S.C. at 11, 471 S.E.2d at 157 (1996); *Ford v. Ford,* 242 S.C. 344, 351, 130 S.E.2d 916, 921 (1963).

A key component of the supreme court's decision to remand the custody order in *Patel* was the fact that "the custody question was hotly contested, with no clear choice for custodial parent apparent from the testimony in the record." 347 S.C. at 286–87, 555 S.E.2d at 389. Since there were no substantial considerations made on record as to the issue of custody apart from the guardian's recommendation, the court refused to declare harmless the judge's reliance on a biased guardian's report. *Id.* Here, a total of ten witnesses (not counting the Husband, Wife, and the guardian) testified about each party's parenting abilities. All ten, three of whom were called by Husband, described Wife as a loving and caring mother. Five witnesses testified that Husband was a capable parent, but

two specifically questioned his parenting ability.[8]  Thus, aside from Husband, the guardian was the *only* witness who believed Husband was the better parent.

Because the family court obviously gave a great deal of weight to the guardian's recommendation, which we have found was based on a biased and incomplete investigation, we reverse the award of custody and remand the case for a new custody hearing.[9]

### III.   Did the trial court err by requiring Wife to pay half of the guardian's fees?

■   Wife next argues that the family court erred by requiring her to pay half of the guardian's fees because the guardian failed to conduct an independent, balanced, and impartial investigation.  We reverse and remand this issue to the family court.

Section 20–7–1553(B) of the South Carolina Code (Supp. 2003) provides that a court-appointed guardian "is entitled to reasonable compensation, subject to the review and approval of the court."  That subsection goes on to list the following factors to guide family courts when awarding guardian fees:

(1)  the complexity of the issues before the court;

(2)  the contentiousness of the litigation;

(3)  the time expended by the guardian;

(4)  the expenses reasonably incurred by the guardian;

(5)  the financial ability of each party to pay fees and costs; and

(6)  any other factors the court considers necessary.

While the ultimate work product of the guardian is not specifically listed under section 20–7–1553, it certainly qualifies as another factor "the court considers necessary."  Thus, we remand this issue along with the issue of custody.  Upon remand, the family court should consider the guardian's incomplete investigation, along with the other factors listed in

---

8.  The parties' next-door neighbor testified that Husband seemed volatile with the children.  Another witness described Husband as "very alienated and angry."

9.  Because we remand the issue of custody, we also remand the issue of attorney's fees and costs.

section 20–7–1553, in determining the amount of fees owed to the guardian.

## IV. Did the trial court err by restricting Husband from traveling outside of the United States with the children?

Husband first contends that the family court erred in restricting his travel with the children because the court wrongfully relied on testimony from Wife's expert that went beyond her qualification as an expert witness. We disagree.

Wife's expert witness was qualified by the court as an expert on child abduction in the Middle East and the remedies that might be available for people who find themselves in that predicament. The court went on, however, to limit that qualification to those precise topics and expressly held that she was not qualified as an expert on the law of Iran. Husband contends that her subsequent testimony on legal remedies for the recovery of abducted children and the recognition of American passports in Iran was admitted in error as it overstepped the limitations of her qualification as an expert.

Permitting an expert witness to testify beyond the scope of his or her expertise can constitute reversible error. *See Nelson v. Taylor*, 347 S.C. 210, 218, 553 S.E.2d 488, 492 (Ct.App.2001). We find, however, that the specific testimony at issue here fell within the expert's qualification. While the family court expressly found that the expert witness was not an expert in the law of Iran, certain issues relating to that law are so intertwined with the parameters of the expert's qualification as to be manifestly compounded. One would be hard pressed to discuss the remedies for child abduction in Iran without at least tangentially touching on the law of Iran. Therefore, we find that Wife's expert witness's testimony fell within that narrow area of Iranian law applicable to her qualification as an expert.

Second, Husband asserts error by the family court on the merits of the restriction itself. Citing cases from other jurisdictions which held that fear of abduction and lack of foreign remedy, without more, are an insufficient showing to reverse a family court on a custodial parent's right to travel with his children, Husband argues that the family court erred

in limiting his right to leave the United States with his children. *See Long v. Ardestani*, 241 Wis.2d 498, 624 N.W.2d 405 (Ct.App.2001) (finding that difficulty of obtaining the return of the child in the event of abduction is but one factor for a court to consider in imposing restrictions and deferring to the family court); *Al–Zouhayli v. Al–Zouhayli*, 486 N.W.2d 10 (Minn.Ct.App.1992) (deferring to the family court's decision not to restrict travel despite threats of abduction and lack of Saudi remedies). We disagree with this argument as well.

The prevailing rule gleaned from the cases to which Husband cites is that appellate courts generally defer to a family court's decision regarding a parent's ability to travel with his or her children. We agree with the Wisconsin Court of Appeals that:

> We are satisfied that the standard of the best interests of the child, comprehensive as it is, permits a full consideration of concerns both about a parent's intention in abducting a child and about the lack of a remedy should that occur. We are also satisfied that there is no need to alter the deference appellate courts give to trial courts' decisions on a child's best interests in order to insure a full consideration of those concerns.

*Long*, 624 N.W.2d at 417–18.

At trial, Wife presented evidence of both specific threats by Husband to relocate the children to Iran as well as testimony concerning the inherent dangers in these types of situations. Testimony was also presented regarding the generalized dangers in travel with children born of Iranian descent to that country and the possibility that Husband could easily fly from another country into Iran if he was allowed to travel with the children outside the United States. Furthermore, even if Husband had every intention to return the children after their visit to Iran, if he were to become incapacitated while he and the children were there, Wife could do very little to retrieve the children. Based on the evidence regarding Husband's threats, the risks of abduction, and the lack of legal recourse in a country which is not a signatory to the Hague Convention, we affirm the family court order banning Husband from travel with the children outside the United States.

## V. Did the family court err in the apportionment of the marital debt?

Husband argues the family court erred in not equally splitting the parties' debts between them. He contends that since all the debt was accrued during the marriage, the entirety of the debt should be split between the parties regardless of whose name it is in. We disagree.

Marital debt should be divided in accord with the same principles used in the division of marital property and must be factored into the totality of equitable apportionment. *See* S.C.Code Ann. § 20–7–472 (Supp.2003); *Jenkins v. Jenkins,* 345 S.C. 88, 103, 545 S.E.2d 531, 539 (Ct.App.2001); *Thomas v. Thomas,* 346 S.C. 20, 27, 550 S.E.2d 580, 584 (Ct.App.2001). The apportionment of marital property is within the discretion of the family court and will not be disturbed on appeal absent an abuse of discretion. *Thomas v. Thomas,* 346 S.C. 20, 27, 550 S.E.2d 580, 584 (Ct.App.2001).

There are many factors which the family court may consider in the apportionment of marital property. On review, the appellate court looks to the fairness of the overall apportionment, and if the end result is equitable, the fact that the appellate court may have weighed specific factors differently than the family court is irrelevant. *Johnson v. Johnson,* 296 S.C. 289, 300–301, 372 S.E.2d 107, 113 (Ct.App.1988). In this review, our focus is on whether the family court addressed the statutory factors governing apportionment with sufficiency for us to conclude that the court was cognizant of these factors. *Doe v. Doe,* 324 S.C. 492, 502, 478 S.E.2d 854, 859 (Ct.App.1996).

In its final order, the family court noted the income of each party, the absence of an alimony grant to Wife and her duty to pay child support, the sale of the marital residence, the tax benefits of the apportionment to each party, and the child custody arrangements. Because these specific findings of the family court comport with those considerations mandated by section 20–7–472, we are satisfied that the court was, in fact, cognizant of the statutory factors of marital apportionment when allocating the marital debt between the parties. Therefore, the family court acted within its discretion in ordering Husband to pay all debts held in his name.

## CONCLUSION

For the foregoing reasons, the order of the family court is **AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

ANDERSON and BEATTY, JJ., concur.