672 S.E.2d 108

**Chastity CHASTAIN, Appellant,**

v.

**Tyson CHASTAIN, Respondent.**

No. 4484.

Court of Appeals of South Carolina.

Heard Dec. 11, 2008.

Decided Jan. 12, 2009.

Irby E. Walker, Jr., and G. Miles Gordon, both of Conway, for Appellant.

Marian D. Nettles, of Lake City and Kevin M. Barth, of Florence, for Respondent.

Philip Bryan Atkinson, of Florence as Guardian Ad Litem.

HEARN, C.J.

Chastity Chastain (Wife) appeals from an order of the family court awarding custody of her three children to Tyson Chastain (Husband) and requiring her to pay $2,500 in private investigator fees. Wife alleges, *inter alia,* that the family court judge erred in holding she engaged in flagrant promiscuity. We disagree with the family court's holding as to flagrant promiscuity but affirm the underlying action.

## FACTS

Husband and Wife married on March 9, 1996. They lived in Columbia until the birth of their first child, Cassidy, on July

15, 1997. After Cassidy was born, they moved to Johnsonville where they lived with Husband's parents for several months before they began renting their own home. Later that same year, Husband and Wife separated, and Husband moved back in with his parents while Wife, along with Cassidy, moved into a double-wide trailer in Lake City. After four or five months of separation, Husband and Wife resolved their marital differences, and Husband moved into the trailer in Lake City with his wife and daughter. However, when Cassidy became old enough to attend school, Husband and Cassidy stayed at Husband's parents' home in Johnsonville during the week so Cassidy could attend school in the Johnsonville School District. During the remainder of their marriage, Husband and Wife had two children: Dawson, born December 3, 2001, and Elizabeth Grace, born December 8, 2003.

During the time they lived in Columbia, Husband played professional golf and worked as an assistant golf professional. After moving to Johnsonville in 1997, Husband continued working as an assistant golf pro in Florence. However, Husband was fired for stealing $5,000 from the golf club.[1] After losing his job, Husband began working as the office manager for a construction company, ASI. When Husband began working for ASI, the company was owned by Wife's uncle. While ASI was owned by Wife's uncle, Husband was required to work long hours and commute to the company's office in Florence. In 2003, Husband's father purchased ASI and moved the company's office to a spare room located in his home in Johnsonville. Currently, Husband works for ASI out of his parents' home and enjoys a very flexible work schedule. Meanwhile, Wife has maintained employment as an administrative assistant at Nan Ya Plastics since she moved to the Johnsonville area.

Early in 2005, Husband suspected Wife was having an extramarital affair, and he hired a private investigator, Alan Capps, to confirm his suspicions.[2] Capps reported Wife was

---

1. Husband's parents re-paid this money to his employer.

2. Husband paid Capps and Allied Services, another private investigator, a total of $2,700.

having an affair with a co-worker, Steve Vargas. Thereafter, Husband commenced a divorce action on the grounds of adultery. However, the family court dismissed the action based on condonation, finding Husband and Wife engaged in sexual relations before the hearing. According to Husband, Wife offered him little help with the children during this time and spent her nights talking on the telephone and away from the house. On July 13, 2005, Husband left the marital home and took the children to his parents' house. The parties have been separated since that time, and, on August 1, Husband commenced this action for divorce, custody, child support, and separate support and maintenance. In October 2005, Wife began an extramarital affair with another co-worker, Lee Dotson.[3]

While the parties were separated, Wife brought Dotson to Cassidy's dance recital. After the dance recital, Wife, along with Dotson, approached Husband and asked where the children were. Husband, who had already sent the children home with his brother, responded by telling Dotson to step outside and that he was going "to beat his tail." Wife and Lee's parents followed the men outside. While outside, Husband's mother attempted to take a picture of Wife and Dotson together. Wife pushed Husband's mother away from her to prevent her from taking the picture. In turn, Husband grabbed Wife by the arm. A physical altercation ensued between Husband and Dotson, ending with the arrest of Husband, his mother, Wife, and Dotson. All eventually pled guilty to disorderly conduct and paid fines.

This would not be the last incident between Husband, Wife, and Dotson. After Husband and Wife had been separated for eight months, Husband began having sexual relations with Dotson's wife, Beth.[4] One night, Dotson and Wife followed Husband and Beth from Ruby Tuesday's to Beth's house. When they arrived at Beth's house, Dotson peered in the window and observed Husband and Beth kissing. After a few moments of deliberation with Wife, Dotson threw a brick through the bedroom window. Then, Dotson and Wife kicked

---

3. Wife and Lee's relationship was ongoing at the time of this action.

4. Lee and his wife were separated, but not yet divorced, at this time.

the door of the residence open. While inside, Dotson and Wife took pictures of Husband as he put his clothes on and of Beth with the bed-covers pulled over her.

In spite of Wife's on-going relationship with Dotson, she claims he has had no interaction with her children. She admits he stayed at her house one night while the children were in her care. However, Wife maintains the children were asleep and did not see Dotson.

The Guardian ad Litem, Phillip Atkinson, visited both parents and prepared a report prior to the court hearing. At Wife's home, the guardian found an exposed light socket. Furthermore, he noted Wife placed her four-year-old, Dawson, in the front seat without a booster seat. Generally, the Guardian acknowledged Wife experienced difficulty controlling the children during his visit. By contrast, the Guardian observed "completely different children" when he visited Husband's house. In Husband's home, the Guardian found the children to be "quiet, respectful, and loving." In addition, the Guardian found Husband took every safety precaution imaginable in his home.

The family court found Husband was not entitled to a divorce based on the fault grounds of adultery because he engaged in a sexual relationship with Dotson's wife before the grant of a divorce. The court, however, granted the parties a divorce on the grounds of living separate and apart for one year. The court awarded Husband custody of all three children, finding Wife engaged in "flagrant promiscuity." However, the family court found Wife's extra-marital affairs did not negatively affect the welfare of her children. Finally, the court directed Wife to pay $2,500 of Husband's $2,700 private investigator bill, stating her adulterous conduct forced Husband to incur these expenses. Wife did not make any post-trial motions and timely served her notice of appeal.

## STANDARD OF REVIEW

On appeal from the family court, this court has jurisdiction to correct errors of law and find facts in accordance with its own view of the preponderance of the evidence. *Mr. T v. Ms. T*, 378 S.C. 127, 131–32, 662 S.E.2d 413, 415 (Ct.App.2008). Although this court may find facts in accor-

dance with our own view of the preponderance of the evidence, we are not required to ignore the fact that the trial judge, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Marquez v. Caudill,* 376 S.C. 229, 239, 656 S.E.2d 737, 742 (2008). In particular, an appellate court "should be reluctant to substitute its own evaluation of the evidence on child custody for that of the [family] court." *Woodall v. Woodall,* 322 S.C. 7, 10, 471 S.E.2d 154, 157 (1996).

## LAW/ANALYSIS

■ Wife argues the family court erred in finding she engaged in flagrant promiscuity and in considering her adulterous conduct in determining the best interests of the children. Initially, Wife notes the family court found her adulterous affairs did not affect her children. In light of this finding, the only way her adulterous affairs could have been relevant in the best interest analysis was if the court found she engaged in flagrant promiscuity. Wife alleges her conduct was not analogous to the conduct of the mother in *Boykin v. Boykin,* and therefore, the trial court committed an error of law in finding her conduct rose to the level of flagrant promiscuity. 296 S.C. 100, 370 S.E.2d 884 (Ct.App.1988). Unlike the mother in *Boykin,* who engaged in five extramarital affairs, Wife was only involved in two extra-marital affairs, while her Husband was involved in one. *Id.* at 102, 370 S.E.2d at 886. Furthermore, the mother in *Boykin* regularly partied with friends until the early morning hours. *Id.* Wife asserts her conduct did not rise to this level; therefore, the family court erred when it found she engaged in flagrant promiscuity.

■ A parent's morality, while a proper consideration in custody disputes, is limited in its force and effect to the relevance it has, either directly or indirectly, on the welfare of the child. *Clear v. Clear,* 331 S.C. 186, 190, 500 S.E.2d 790, 792 (Ct.App.1998) (citing *Davenport v. Davenport,* 265 S.C. 524, 527, 220 S.E.2d 228, 230 (1975)). Thus, conduct that is immoral must also be shown to be detrimental to the welfare of a child before it is of legal significance in a custody dispute. *Stroman v. Williams,* 291 S.C. 376, 379, 353 S.E.2d 704, 705

(Ct.App.1987). However, flagrant promiscuity inevitably affects the welfare of the child and establishes "a watershed in the court's quest to protect the best interests of a minor child." *Boykin*, 296 S.C. at 102, 370 S.E.2d at 886.

We believe the family court erred in finding Wife's conduct rose to the level of flagrant promiscuity. Flagrant promiscuity serves only as an exception to the general rule, which requires immoral conduct to have a detrimental affect on the welfare of the child in order to have legal significance. *Id.* Because it only exists as an exception, we believe it is meant to be invoked sparingly—to embrace that rare situation of glaringly bad and outrageous conduct not present in these facts. Here, Wife engaged in two extra-marital affairs, while Husband engaged in one extra-marital affair. In addition, Wife essentially lives with her current boyfriend, Dotson, when her children are not in her care. Also, Wife brought Dotson to her daughter's dance recital, and a physical altercation between Dotson and Husband ensued. In our view, these facts do not fall within the ambit of flagrant promiscuity.

Accordingly, the family court erred in finding Wife's conduct rose to the level of flagrant promiscuity. Because the family court found Wife's immoral conduct did not detrimentally affect the welfare of her children and because her conduct does not fall within the flagrant promiscuity exception, the family court also erred in considering her adulterous conduct in the best interests of the child calculus. We now turn to whether the family court's award of custody to Husband was in the best interests of the children.

█ Wife contends the family court erred in awarding custody to Husband. Wife claims the best interests of the children would have been served by granting custody to her. Specifically, Wife asserts she, unlike Husband, regularly takes the children to church. Moreover, she served as the primary care-taker of the children during their marriage while Husband spent his time playing golf.

█ "The paramount and controlling factor in every custody dispute is the best interests of the child." *Brown v. Brown*, 362 S.C. 85, 90, 606 S.E.2d 785, 788 (Ct.App.2004). The family court must consider the character, fitness, attitude, and inclinations on the part of each parent as they impact on

the child. *Epperly v. Epperly*, 312 S.C. 411, 415, 440 S.E.2d 884, 886 (1994). Psychological, physical, environmental, spiritual, educational, medical, family, emotional, and recreational aspects of the child's life should also be considered. *Wheeler v. Gill*, 307 S.C. 94, 99, 413 S.E.2d 860, 863 (Ct.App.1992). "In other words, the totality of circumstances unique to each particular case constitutes the only scale upon which the ultimate decision can be weighed." *Paparella v. Paparella*, 340 S.C. 186, 189, 531 S.E.2d 297, 299 (Ct.App.2000).

The best interests of the children are served by awarding custody to Husband, without considering Wife's immoral conduct. First, the family court found Wife exposed her children to safety risks while they were in her care. Specifically, Wife transported her four-year-old, Dawson, in the front seat without a booster seat and had an exposed electrical socket in her home. Second, both Husband and Wife agree Johnsonville School District, where Husband lives, offers a better education for their children than Lake City School District, where Wife lives. In fact, while the parties were married and living in Lake City, Husband and Cassidy, the only child old enough to attend school, stayed at Husband's parents' home during the week so she could attend school in Johnsonville. By awarding custody to Husband, the children can attend school in this more desirable school district. *See Glanton v. Glanton*, 314 S.C. 58, 60, 443 S.E.2d 810, 812 (Ct.App.1994) ("The education of a child is something that affects his best interest.").

The Guardian found Wife experienced difficulty controlling the children while in her care. During the Guardian's visit to her home, only two children—Elizabeth Grace and Dawson— were present. Elizabeth Grace repeatedly screamed and cried when denied her way and refused to listen to Wife's request to apologize to her brother. In spite of her refusal to listen to her mother, Wife allowed Elizabeth Grace to continue playing without consequence. By contrast, Wife spanked Dawson and sent him to timeout for pushing Elizabeth Grace's bike. The inability of Wife to control her children, and the inconsistent manner in which she disciplined her children greatly concerned the Guardian. However, the Guardian observed completely different children in the care of Husband. While in his care, the children were "quiet, respectful, and loving." The fact Husband exhibits more control over the children and

instills discipline in their lives impacts the best interests of the child analysis. *See Paparella,* 340 S.C. at 189, 531 S.E.2d at 299 (noting the totality of the circumstances is the only way to determine the best interests of the children).

In addition, Husband works from home and maintains a flexible work schedule, which allows him to spend more time with the children and adjust his schedule to accommodate their needs. Also, Husband lives with his mother, who is retired and willing to do whatever necessary to help in raising the children. By contrast, Wife's work schedule is very inflexible, and she has no one living with her in the house to help in raising the children. Lastly, while Wife served as the primary caretaker of the children for a large part of their marriage, Husband has changed very much since this early stage of their marriage and now freely fills these roles. As Wife stated, "He wants to be daddy of the year." "He doesn't play golf anymore. He doesn't do anything." In addition, Wife acknowledged, since the separation, Husband cooks, cleans, and bathes the children. In considering all of the factors in this case, the best interests of the children are served by awarding custody to Husband.

■■■ For the final issue on appeal, we must consider whether the family court abused its discretion in ordering Wife to pay $2,500 in private investigator fees to Husband. Wife argues Husband sought a divorce on the grounds of adultery. However, the family court refused to grant a divorce on this basis because he also engaged in an extramarital affair. Specifically, the family court found the affirmative defense of recrimination barred the grant of a divorce based on adultery in this case. Ultimately, the court ordered Wife to pay the private investigator fees because her flagrant adulterous conduct caused Husband to incur these expenses.

■■■ Section 20–3–120 of the South Carolina Code (1976 & Supp.2007) authorizes the family court to order payment of litigation expenses, including attorney's fees, to either party in a divorce action. An award of attorney's fees rests within the sound discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. *Doe v. Doe,* 319 S.C. 151, 157, 459 S.E.2d 892, 896 (Ct.App.1995). The family court is given broad discretion in this area. *Id.*

"The same considerations that apply to awarding attorney's fees also apply to awarding litigation expenses." *Patel v. Patel,* 359 S.C. 515, 533, 599 S.E.2d 114, 123 (2004) (citing *Nienow v. Nienow,* 268 S.C. 161, 173, 232 S.E.2d 504, 510 (1977)). Reimbursable expenses include reasonable and necessary expenses incurred in obtaining evidence of a spouse's infidelity. *Stevenson v. Stevenson,* 295 S.C. 412, 415, 368 S.E.2d 901, 903 (1988).

This issue is not preserved for appellate review. *See I'On v. Town of Mt. Pleasant,* 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) (noting an appellate court can affirm for any reason appearing in the record). Wife never objected to the family court's award of private investigator fees to Husband at trial or in a post-trial motion. *See Washington v. Washington,* 308 S.C. 549, 551, 419 S.E.2d 779, 781 (1992) (stating issues not raised to the family court during trial or through post-trial motions are not preserved for appellate review). As a consequence, this issue is not preserved for appeal.

Accordingly, the decision of the circuit court is

**AFFIRMED AS MODIFIED.**

SHORT, J., and KONDUROS, J., concur.