713 S.E.2d 309

**James REED, Respondent,**

v.

**Jennifer PIEPER, Appellant.**

**No. 4837.**

Court of Appeals of South Carolina.

Heard Nov. 3, 2010.

Decided June 1, 2011.

426

Donald Bruce Clark, of Charleston; James A. Bell, of St. George; Robert N. Rosen, of Charleston, for Appellant.

J. Michael Taylor, of Columbia; Lewis C. Lanier, of Orangeburg, for Respondent.

WILLIAMS, J.

Jennifer Pieper (Mother) appeals from the family court's order awarding custody of the parties' minor child to James Reed (Father). Further, Mother claims the family court erred in failing to grant her attorney's fees and costs. We affirm.

## FACTS/PROCEDURAL HISTORY

Father and Mother were never married, but they are the parents of one child, L.R., who was born on July 28, 2005. The relationship between Father and Mother began in December 2003 while Father was married to Renae Reed. In March 2004, while Father was separated from Ms. Reed, Mother began working at one of Father's companies, and she moved into an apartment owned by one of his companies. Mother and Father began living together soon thereafter, and in November 2004, Mother discovered she was pregnant. In February 2005, Father proposed to Mother, and the parties were engaged for a short period of time until Mother returned the ring and moved in with her parents. The couple experienced many separations and attempts at reconciliation.[1]

Shortly after L.R. was born, Father commenced this action seeking custody of the child. The family court issued a *pendente lite* order, granting joint custody of the child to the parties and requiring Father to pay Mother child support. Mother and Father continued dating one another. During the pendency of this action, maternal grandmother, Linda Pearson, signed an affidavit recommending Father be awarded custody of her grandchild, L.R., while Mother obtained treatment for her emotional condition.[2] Father once again pro-

---

1. Father and Mother were engaged a total of four times.

2. Notably, Linda Pearson subsequently repudiated her affidavit as to her daughter's condition at the hearing.

posed marriage to Mother, and she moved back in with Father in October 2006 when L.R. was a one-year old. After another dispute in December 2006, Mother permanently moved out of Father's home and returned to her parents' home.

At the final hearing on May 12–13, 2008, the family court received testimony from the parties, their witnesses, and the guardian ad litem. After carefully weighing the evidence, the family court found that "both parents have an obvious love for their son" and "have experience in caring for this child." Finding both parents to be fit, the family court considered the "totality of the circumstances" and concluded it was in the best interest of L.R. to grant Father sole custody with visitation to Mother consistent with the standard visitation schedule. In addition, the family court stated both parties were to pay their own attorney's fees and costs.

On September 25, 2008, Mother timely filed a Rule 59(e), SCRCP, motion seeking to alter or amend the final order. By order dated October 20, 2008, the family court denied Mother's motion to reconsider. This appeal followed.

## STANDARD OF REVIEW

On appeal from the family court, this court reviews factual and legal issues de novo. *Simmons v. Simmons*, 392 S.C. 412, 414–15, 709 S.E.2d 666, 667 (2011); *see Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011). Although this court reviews the family court's findings de novo, we are not required to ignore the fact that the trial court, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Lewis*, 392 S.C. at 387–89, 709 S.E.2d at 653–54. The burden is upon the appellant to convince this court that the family court erred in its findings. *Id.* at 388–92, 709 S.E.2d at 654–56.

With respect to custody determinations, the appellate courts have consistently shown deference to the family court in electing between fit parents. *Altman v. Griffith*, 372 S.C. 388, 393, 642 S.E.2d 619, 621 (Ct.App.2007). "In gauging between fit parents as to who would better serve the best interests and welfare of the child in a custodial setting, the family court judge is in a superior position to appellate judges

who are left only to review the cold record." *Altman,* 372 S.C. at 393, 642 S.E.2d at 622. "For obvious and compelling reasons, as an appellate court, we are reticent to substitute our judgment on the custody determination between fit parents for that of the family court judge." *Id.*

## LAW/ANALYSIS

### A. Best Interests of L.R.

 Mother's only challenge to the family court's decision to award Father sole custody of L.R. is that it was against the child's best interests.[3] We disagree.

 In all child custody controversies, the controlling considerations are the child's welfare and best interests. *Cook v. Cobb,* 271 S.C. 136, 140, 245 S.E.2d 612, 614 (1978). In determining custody, the family court "must consider the character, fitness, attitude, and inclinations on the part of each parent as they impact the child." *Woodall v. Woodall,* 322 S.C. 7, 11, 471 S.E.2d 154, 157 (1996). In other words, "the totality of the circumstances *peculiar to each case* constitutes the only scale upon which the ultimate decision can be weighed." *Parris v. Parris,* 319 S.C. 308, 310, 460 S.E.2d 571, 572 (1995) (emphasis added).

The family court properly considered evidence on the strengths and weaknesses of each parent and weighed the totality of circumstances in determining the child's best interests would be served by awarding custody to Father. After extensive testimony on the custody issue from the parties, mental health professionals, and the guardian ad litem, the family court made numerous in-depth findings to support its decision to award custody of the child to Father. We find ample support in the record for these findings.

Father has three children from a previous marriage that he has successfully raised with his ex-wife, Renae Reed. Father has had sole custody of his eldest child while sharing joint custody with his ex-wife of his other two children since their divorce in 2004. Ms. Reed testified on Father's behalf at the hearing, detailing Father's exemplary history as a parent and

---

3. Mother never challenges Father's fitness as a parent.

his continued role as a father to their three children. During the hearing, Ms. Reed stated that Father spends a significant amount of time with the children, coaching his sons' sports teams, staying involved in his daughter's life, and generally having a very close relationship with each of the children. Father has also taken an active role in the children's educational pursuits, spending extra time studying with his eldest son and seeking a tutor for his son's algebra class. In addition, Ms. Reed described Father's role in the care of their daughter, who was born three months premature, as exceptional. In order to care for his daughter who suffered from heart and respiratory complications, Father promptly learned the necessary training including CPR, the proper use of a nebulizer machine, and how to administer her medications. Father took all of these precautions despite Ms. Reed's occupation as a nurse. Ms. Reed's testimony credited Father for his child rearing abilities and stated that his "parenting is perfect." In short, Ms. Reed believed Father exceeded all expectations as a parent.

In addition, Father's history demonstrates the importance he places on education for himself and his children. While Ms. Reed was pregnant with Father's first child, Father went back to college to support his family. Taking out a student loan and working a forty-hour work week while attending school, Father obtained a four-year degree in three years. This educational advancement allowed Father to become a successful businessman, operating several different corporations. *See Davenport v. Davenport,* 265 S.C. 524, 528, 220 S.E.2d 228, 230 (1975) (stating that education and parenting skills of a parent are legitimate factors to consider in custody determinations). By contrast, the family court found Mother has generally stated goals, but she does not have a demonstrable record of taking concrete steps to achieve those goals. Moreover, Mother appears to be more focused on what "having her child taken from her" will mean to her personally, rather than what is in L.R.'s overall best interests. *See Routh v. Routh,* 328 S.C. 512, 516, 492 S.E.2d 415, 418 (Ct.App.1997) (holding that a change in custody was warranted due to guardian ad litem's and psychologist's concern that mother was immature and impulsive and at times did not act in the best interests of her daughter).

Finally, the family court emphasized the stability of Father's home environment in awarding custody to Father. As a result of Father's business success and the sale of the majority of his corporations, Father works from home and maintains a flexible work schedule, which allows him to spend more time with L.R. and adjust his schedule to accommodate L.R.'s needs. *See Shainwald v. Shainwald*, 302 S.C. 453, 460, 395 S.E.2d 441, 446 (Ct.App.1990) (upholding an award of custody based largely on the father's ability to spend time with the children). Although Mother is critical of Father's personal success, it is Father's financial well-being that actually allows him to have the everyday flexibility to provide a more stable environment than Mother. *See Chastain v. Chastain*, 381 S.C. 295, 305, 672 S.E.2d 108, 113 (Ct.App.2009) (affirming custody award to a husband who had a flexible work schedule and worked from home, whereas the mother's work schedule was very inflexible). In addition to being able to spend more time with L.R. than Mother, Father's home provides many opportunities for recreation and interaction with L.R.'s three half-siblings, Jimmy, age 17, Elizabeth, age 13, and Matthew, age 11, at baseball games, family outings, and meals.[4] By contrast, Mother has had several employment changes, has shown no real direction as to her future employment, and L.R. would spend as much as forty hours per week in daycare were Mother to have custody. *See Gandy v. Gandy*, 297 S.C. 411, 413, 377 S.E.2d 312, 313 (1989) (remanding matter to family court to consider court-appointed expert testimony that the children should be placed with the parent who was willing to stay with them and not rely on babysitters, even relatives). Moreover, although noting Mother functions well and poses no threat of harm to the child, the family court order found Mother continues to be under a doctor's care for her mental health issues and emotional problems. Mother's continued treatment for depression was a significant factor in the family court finding Father would provide a more stable, healthy environment for L.R.

---

4. The dissent comments that these circumstances are now insignificant because of the passage of time. Our review is limited to the record from the family court hearing and cannot include facts not presented to the family court, nor can we speculate about any changed circumstances that may exist today.

The family court's in-depth findings show it properly considered the fitness of each parent and the relevant factors that would affect L.R.'s best interests in making its custody determination. *See Pirayesh v. Pirayesh*, 359 S.C. 284, 296, 596 S.E.2d 505, 512 (Ct.App.2004) ("When determining to whom custody shall be awarded, the court should consider all the circumstances of the particular case and all relevant factors must be taken into consideration.").

We note a majority of Mother's argument on appeal centers around the lengthy and dramatic history of the parties' relationship with little focus on why Mother is better suited to be L.R.'s primary caretaker. While much of both parties' testimony at the final hearing focused on the parties' relationship, Mother has failed to sufficiently present evidence proving that the family court's award of custody to Father was contrary to the child's best interests. *See Jones v. Ard*, 265 S.C. 423, 426, 219 S.E.2d 358, 359–60 (1975) (finding that when both parties are fit and proper to have custody, the family court must make the election, and [the appellate court] must defer to its decision when the family court's findings and conclusions are supported by the record).

On appeal, Mother asserts that as the primary caretaker of L.R., the child's best interests would be served by awarding her custody. Mother's argument is without merit. L.R. was born on July 28, 2005 and, shortly thereafter, Father filed this action seeking custody of the child. Not even six months later, on December 12, 2005, the family court issued a *pendente lite* order granting Father and Mother joint custody of L.R. Moreover, after the family court's final order on August 28, 2008, Father has had sole custody of L.R. Since L.R. was six months old, Father has either had joint or sole custody of his son. There is no evidence in the record establishing that the Mother has been the primary caretaker of L.R. and the family court did not make any finding to that effect. As a result, Mother's argument that her role as primary caretaker weighs in her favor in determining L.R.'s best interests is misplaced.

Mother argues and the dissent notes the underlying reason Mother should have custody is evidence in the record of Father's manipulative and controlling nature. In particular,

the dissent argues L.R.'s maternal grandmother, Linda Pearson, was manipulated into signing an affidavit recommending Father be awarded custody of her grandchild, L.R., while Mother obtained treatment. It was only at trial that Mrs. Pearson recanted her affidavit, testifying she signed the affidavit because Father was going to use it to "force [Mother] to come back" to him and not to obtain custody of L.R. But the family court did not find the grandmother's extraordinary act of submitting an affidavit unfavorable to her daughter to have been obtained through manipulation by Father.

Finally, Mother argues Father's "promiscuity actually has had and will have an adverse effect on [L.R.]." Mother asserts Father's promiscuity in having five children with three different women and his general lack of morals would not provide the best environment for L.R. This issue is not preserved for our review. Father's alleged promiscuity was not raised to or ruled upon by the family court. In addition, the issue was not addressed in the final order or raised in the motion for reconsideration. Therefore, this issue is not properly before this court for review. *See S.C. Dep't. of Soc. Servs. v. Basnight*, 346 S.C. 241, 252, 551 S.E.2d 274, 280 (2001) (holding an issue not raised to or ruled on by the family court should not be considered by the appellate court); *see also Richland Cnty. v. Carolina Chloride, Inc.*, 382 S.C. 634, 656, 677 S.E.2d 892, 903 (Ct.App.2009) (finding appellant waived issue by not arguing it in the initial appellate brief). We address this issue, however, because "procedural rules are subservient to the court's duty to zealously guard the rights of minors." *Joiner ex rel. Rivas v. Rivas*, 342 S.C. 102, 107, 536 S.E.2d 372, 374 (2000).

In South Carolina, a parent's morality, while a proper consideration in custody disputes, is "limited in its force to what relevancy it has, either directly or indirectly, to the welfare of the child." *Davenport*, 265 S.C. at 527, 220 S.E.2d at 230; *see also Shainwald*, 302 S.C. at 460, 395 S.E.2d at 445–46; *Stroman v. Williams*, 291 S.C. 376, 378, 353 S.E.2d 704, 705 (Ct.App.1987). Thus, conduct that is immoral must also be shown to be detrimental to the welfare of a child before it is of legal significance in a custody dispute. *Stroman*, 291 S.C. at 379, 353 S.E.2d at 705. However, flagrant

promiscuity inevitably affects the welfare of the child and establishes "a watershed in the court's quest to protect the best interests of a minor child." *Boykin v. Boykin*, 296 S.C. 100, 102, 370 S.E.2d 884, 886 (Ct.App.1988).

Here, Mother asserts Father allowed his ex-girlfriend and the mother of his fifth child to stay overnight at his house while his other children were present. Mother did not present any evidence that L.R. observed the ex-girlfriend unclothed or that any sexual activity occurred in his presence. In essence, there is no evidence that L.R. was exposed to an adulterous relationship or any other immoral conduct detrimental to his welfare. *See Kisling v. Allison*, 343 S.C. 674, 683, 541 S.E.2d 273, 277 (Ct.App.2001) (finding a father's decision to not expose the minor child to his new relationship until it was six months old was a significant factor in determining custody of a child in South Carolina). Moreover, there is no evidence that Father's conduct rose to the level of flagrant promiscuity. *See Chastain*, 381 S.C. at 303, 672 S.E.2d at 112 (reversing the family court's finding of flagrant promiscuity when wife engaged in two extra-marital affairs, while husband engaged in one extra-marital affair). Finally, we note Mother's challenge to Father's lifestyle and the alleged detrimental effect it has on L.R. is in essence the same relationship and position Mother once occupied with regards to Father's children from his previous marriage.

Admittedly, neither parent is perfect. The record certainly does not reflect that the evidence is so clearly in Mother's favor to warrant a finding of an abuse of discretion by the family court, and Mother has failed to sustain her burden of convincing this court that the family court did not consider L.R.'s welfare and best interests in its custody decision. *See Shorb v. Shorb*, 372 S.C. 623, 628, 643 S.E.2d 124, 127 (Ct.App. 2007) ("The burden is upon the appellant to convince this court that the family court erred in its findings of fact."). Father appears to be more focused on the overall welfare and care of L.R. The record shows the family court's decision was buttressed by the fact Father has demonstrated very good parenting skills in raising three children. In our judgment, the record supports the view that L.R.'s best interest is served by an award of custody to Father.

## B. Attorney's Fees and Costs

■ Mother maintains the family court abused its discretion in refusing to award her attorney's fees and costs.[5] Specifically, Mother argues the family court did not properly weigh the requisite factors to award attorney's fees because its decision was based entirely on the lack of a beneficial result. We disagree.

■ Section 20–3–130(H) of the South Carolina Code (Supp.2010) authorizes the family court to order payment of litigation expenses, including attorney's fees, to either party in a divorce action. An award of attorney's fees rests within the sound discretion of the family court and should not be disturbed on appeal absent an abuse of discretion. *Doe v. Doe,* 319 S.C. 151, 157, 459 S.E.2d 892, 896 (Ct.App.1995). The family court is given broad discretion in this area. *Id.* "The same considerations that apply to awarding attorney's fees also apply to awarding litigation expenses." *Patel v. Patel,* 359 S.C. 515, 533, 599 S.E.2d 114, 123 (2004) (citing *Nienow v. Nienow,* 268 S.C. 161, 173, 232 S.E.2d 504, 510 (1977)).

■ In determining whether attorney's fees should be awarded, the following factors should be considered: (1) the party's ability to pay his or her own attorney's fees; (2) the beneficial results obtained by the attorney; (3) the parties' respective financial conditions; and (4) the effect of the attorney's fees on each party's standard of living. *E.D.M. v. T.A.M.,* 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992).

The family court did not abuse its discretion in declining to award either party attorney's fees in this matter. Although the family court did not delineate its consideration of the *E.D.M.* factors, this court may, through its own view of the preponderance of the evidence, find that the family court's decision regarding attorney's fees was proper. *See Henggeler v. Hanson,* 333 S.C. 598, 601, 510 S.E.2d 722, 724 (Ct.App. 1998) ("On appeal from the family court, this court has jurisdiction to correct errors of law and find facts in accordance with its own view of the preponderance of the evidence."). Our review of the evidence is in accord with the family court's finding.

---

5. Mother incurred $14,225 in attorney's fees and $506.50 in costs.

Because Father succeeded in obtaining custody of the child, the "beneficial results" factor from *E.D.M.* weighs in Father's favor. Moreover, we find the family court implicitly considered the financial disparity between the parties and the effect its decision would have on Mother's standard of living by requiring Father to be solely responsible for paying the guardian ad litem's outstanding fees, and in only requiring Mother to pay $100 per month in child support, despite being the noncustodial parent. Therefore, considering the *E.D.M.* factors under this court's view of the preponderance of the evidence, we find the family court did not abuse its discretion in declining to award either party attorney's fees in this matter.

## CONCLUSION

For the foregoing reasons, the family court's order is

**AFFIRMED.**

FEW, C.J., concurs. SHORT, J., dissents in a separate opinion.

SHORT, J. (dissenting).

I respectfully dissent. In my view, the best interests of L.R. would be served by awarding custody to Mother. *See Simmons v. Simmons*, 392 S.C. 412, 414–15, 709 S.E.2d 666, 667 (2011) (finding on appeal from the family court, the appellate court reviews factual and legal issues de novo).

Mother raises numerous meritorious issues in her appeal. First, throughout the tumultuous time these parties were together, Mother was a stay-at-home mom and the primary caretaker of L.R.[6] The guardian ad litem found L.R. to be an active, healthy, and happy child. The guardian found both parents to be fit. I find Mother's role as primary caretaker weighs in her favor in determining custody.

The family court considered Father's additional time to devote to L.R., and that L.R. would be in daycare if living with Mother. However, Father admitted he intended to enroll L.R. in a pre-kindergarten program. I find this is not a factor

---

6. L.R., born July 28, 2005, was almost three at the time of the hearing.

weighing in Father's favor as L.R. will be in school now regardless of which parent is awarded custody.

The family court also considered that L.R. would have more opportunity for interaction with his half-siblings in the custody of Father. Furthermore, the family court found Father had demonstrated very good parenting skills in the care, education, and upbringing of his older children. The only half-sibling living full-time with Father at the time of the hearing was Father's seventeen-year-old son. Father's other two children, aged thirteen and eleven at the time, lived either with their mother, or with Father part-time. The majority of Father's parenting skills at the time of the hearing were exercised as a part-time parent. At this time, all of these children have either completed high school, or are very close to completion, rendering this consideration relatively insignificant.

Finally, the family court relied on Father's financial means and education. As noted by Mother, Father's wealth will be equally available to support L.R. regardless of which parent is awarded custody. As to Father's education compared to Mother's education, the family court failed to consider that Mother was a stay-at-home mom while living with Father, and his influence in L.R.'s future education should, like his financial means, be available to L.R. regardless of whether or not Father has primary custody.

Based on the above factors, I find the parties in relative parity as to the best interests of L.R. in determining custody. Mother also raises the issue of the impact of Father's promiscuity on L.R.[7] Although certainly a concern, the primary issue underlying my view that Mother should have custody is the evidence in the record of Father's manipulative and controlling nature.

For instance, the psychologist[8] concluded the relationship between the parties was not balanced. Father required Mother submit to his control. Father informed the psychologist

---

7. Father has children with three women, and in September 2008, he married a pregnant 27–year–old woman.

8. Per order of the family court, Father and Mother were referred for psychological evaluation.

that he would prefer the child be in Mother's care as long as Mother was not irresponsible, abusive, or neglectful. According to the psychologist, Mother did not present a significant threat of harm of negligent or abusive parenting.

There are other instances of Father's controlling and manipulative nature in the record. For example, L.R.'s maternal grandmother (Grandmother) testified Father manipulated her into signing an affidavit that Father had drafted, in which Grandmother recommends Father receive custody, with Mother granted visitation supervised by Grandmother. At trial, Grandmother testified she signed the affidavit because Father manipulated her into believing he was going to use it to "force [Mother] to come back" to marry him, and that he would never use it to take L.R. from Mother. Another example of Father's need to control was reported at trial by a parent educator who worked with L.R. and Mother for two years to assess L.R.'s developmental progress. The educator testified Father threatened to report her to the State Department of Education because she worked with L.R. and Mother without his participation. In another manipulative act, Father reported Mother for criminal domestic violence based on an argument during which Mother slapped Father.[9] According to the Sheriff's Department Incident Report, Father wanted to file the report "for when [they] go to family court for custody of the baby." Father constantly threatened Mother with her loss of custody if she did not follow his directives, be they reconciling with him or other matters. During one reconciliation period, Father presented Mother with an agreement that would grant him custody in exchange for agreeing to marry Mother and have another child with her. This reconciliation did not last long and ended with Father moving all of Mother and L.R.'s belongings to Grandmother's house and posting a "no trespassing" notice at their house.

Based on my view of the preponderance of the record, I find no evidence to support the removal of L.R. from Mother, his primary caretaker.[10] *See Patel v. Patel*, 359 S.C. 515, 527, 599

---

9. Mother reported Father goaded her into the slap, which she acknowledged was inappropriate.

10. Although the family court made no specific finding as to which parent was L.R.'s primary caretaker, there is evidence that Mother was

S.E.2d 114, 120 (2004) ("Although there is no rule of law requiring custody be awarded to the primary caretaker, there is an assumption that custody will be awarded to the primary caretaker."). Accordingly, I would reverse.

---

in actuality the primary caretaker: 1) Mother was sole caretaker for first two months of L.R.'s life; 2) for a period of time, L.R. visited Father only if Mother was also visiting Father; 3) the parties exercised the joint custody arrangement for only ten months before Mother moved back in with Father in October 2006; 4) Mother testified she kept L.R. numerous times at Father's house during his week; and 5) the parties did not separate for the last time until approximately nine months before the final hearing.