758 S.E.2d 206

Sherri SIMCOX–ADAMS, Appellant,

v.

Michael E. ADAMS, Respondent,

and

Jimmy Simcox and Barbara Simcox, Third–Party Defendants.

Appellate Case No. 2011–196406.

No. 5215.

Court of Appeals of South Carolina.

Heard Nov. 12, 2013.

Decided April 2, 2014.

Stephen D. Schusterman, of Schusterman Law Firm, of Rock Hill, for Appellant.

George W. Speedy, of Speedy, Tanner, Atkinson & Cook, LLC, of Camden, for Respondent.

WILLIAMS, J.

Sherri Simcox–Adams (Wife) claims the family court erred in granting primary custody of the parties' daughter (Child) to Michael Adams (Husband) because it improperly relied on the investigation and report of the guardian ad litem (GAL). Wife also argues her due process rights were violated by the GAL's failure to comply with the requirements of section 63–3–830(A)(6) of the South Carolina Code (2010). Additionally, Wife contends the family court erred when it found Wife's inheritance was transmuted into marital property. We affirm.

**FACTS/PROCEDURAL HISTORY**

Husband and Wife married in 1994 and have one daughter (Child). On October 2, 2008, Wife filed for divorce on the grounds of adultery and sought child custody, child support, alimony, equitable distribution, and attorney's fees. Husband timely answered and counterclaimed. After a temporary

hearing in August 2009, the family court ordered joint custody of Child to Husband and Wife, with Wife as Child's primary custodian. The family court appointed Leland Summers to serve as the GAL and to assist the court on the issue of child custody.

The family court held a final hearing on May 2 and 3, 2011. At the commencement of the hearing, the parties agreed to waive alimony and any interest in the other party's retirement or 401(k) accounts. The GAL also submitted his report to the family court. Wife, however, did not object to the timeliness of its submission. Wife, Husband, the parties' treating psychologist, Dr. J. Patrick Goldsmith, and the GAL all testified at the final hearing.

Wife first testified in support of her claim that she should be Child's primary caretaker. She highlighted several incidents she believed Husband put Child in danger. She testified Husband did not tell her when he accidentally squirted sunscreen in Child's eye, which eventually resulted in an eye infection. She also claimed Husband drove his jet ski recklessly while Child was riding with him. According to Wife, the jet ski flipped over and Child was thrown into the water. Wife stated Husband permitted Child to drive a golf cart without supervision and Child almost ran the golf cart off the road.

During her testimony, Wife was questioned about her mental state and a prior "episode" of catatonic symptoms she experienced in August 2008. In response, Wife stated it was brought on by a urinary tract infection, and contrary to Husband's claims, she was never instructed to undergo a psychological evaluation. She stated there were no other episodes and it did not affect her ability to parent Child. Wife claimed Husband had concocted that story in an attempt to get custody of Child. In regards to her contact with the GAL, she stated she only met with the GAL one time, and he had never contacted her outside that meeting.

Next, Dr. Goldsmith testified regarding his evaluation of Wife, Husband, and Child. Dr. Goldsmith diagnosed Child with an adjustment disorder and depressed moods; Husband with an adjustment disorder and anxiety; and Wife with an adjustment disorder "with mixed disturbance of emotions and

conduct, to include paranoid traits." According to Dr. Gold-smith, Child said Wife would make untruthful statements about Husband. Child also told Dr. Goldsmith that Wife instructed Child to say she wanted to live with Wife, whereas Father instructed Child to simply tell the truth. Dr. Gold-smith also recalled Wife's statement during their interview that she would not be opposed to having Husband's parental rights terminated because of their disagreements and Hus-band's anger issues. Dr. Goldsmith testified Wife had been extremely difficult to communicate with in the past, but she was cooperative throughout her interview for this evaluation.

The GAL also presented his observations and concerns at the final hearing. He testified he had two major concerns: (1) the differences in the parents' discipline styles; and (2) Wife's prior mental "episode" and its potential effect on Child's wellbeing if Wife relapsed. When questioned, the GAL ac-knowledged he was unaware of any other mental incidents in the three years since that single episode. The GAL specifical-ly expressed concern over Wife's behavioral issues and her lack of willingness to cooperate with Husband when conflicts arose. The GAL also stated Child expressed a preference to live with Husband.

On cross-examination, Wife's counsel asked the GAL about his investigation into Wife's concerns over Child's safety while in Husband's care. In response, the GAL stated Child denied being thrown off a jet ski into the water. The GAL admitted he never discussed with Child whether Husband permitted her to drive a golf cart by herself. Wife's counsel also questioned the GAL as to why he failed to interview Wife prior to the final hearing. The GAL stated he attempted to contact Wife "several times" at the phone number she provided to him, but she never answered, and he was unable to leave a message because her voicemail was always full. As a result, he met with her when trial started. The GAL explained that in contested cases, he prefers to do his final interviews close to the final hearing because his observations would be more accurate and it would be less costly to not have to reinterview the parties if there was a continuance.

The GAL also submitted his report to the family court, in which he found the following: (1) Child had a close relation-

ship with both her parents; (2) both parents demonstrated appropriate child-rearing skills and a genuine concern for Child's best interests; (3) Child indicated Wife spoke negatively about Husband in the presence of Wife's family, whereas Husband did not; and (4) Wife and her parents followed Husband "almost to the point of stalking." As required by statute, the GAL made no recommendation in his report or at the final hearing as to custody.

In addition to the issue of custody, the parties contested the marital nature of the parties' inheritance. Husband and Wife testified they each received an inheritance worth approximately $70,000 to $80,000. Husband's inheritance was invested into the parties' home, which was titled in both parties' names. Wife's inheritance was placed into a joint account, which was titled in both of their names. Wife, however, withdrew these funds from the joint account and created a new account in her and her parents' names after the parties filed for divorce.

Wife stated Husband never contributed any funds to the joint account. Wife admitted that Husband's name was on the account, but she claimed it was only on the account "in case of emergency" and it was more of "an attachment for convenience." Husband testified the account was used as a "nest egg" and the parties only used the account when Wife was out of work and they needed the additional money to pay bills. Husband stated,

> My [inheritance] money was for the house. When she inherited her money, we just used her account like our nest egg kind of account. If something comes (sic) up like when she went out of work, we would have that to help pay for bills, things like that. We never tried to touch the money because that was our nest egg and we used my accounts to pay all the household bills.... I would sometime[s] move [money] around ... whenever I'd pay bills with my account on the internet, I would go to [the joint] account sometimes if we needed to move money to certain accounts.

After considering the testimony and evidence presented at the hearing, the family court granted the parties a divorce based on one year's continuous separation. In its final order, the family court awarded joint custody of Child to Husband and Wife, with Husband as Child's primary custodian. In chang-

ing the custodial arrangement, the court noted several incidents when Wife improperly interfered with Husband's visitation with Child. Specifically, the court found there were instances when Wife's parents and Husband would both arrive to pick up Child from school. Husband would acquiesce and allow Wife's parents to take Child from school to avoid conflict. The family court found Wife exhibited poor judgment in dealing with the needs of Child as they related to Husband. In addition, the family court was concerned that Wife created a stressful atmosphere for Child and would be less likely to foster a positive relationship with Husband than if Husband was Child's primary caretaker.

The family court also ruled on whether each party's inheritance was marital property. Despite Wife's claim that her inheritance was her separate property, the family court found additional marital funds were deposited into the joint account. The family court found Wife's testimony that Husband's name was only on the account for convenience was not credible and concluded these funds were intended to be a "rainy day" fund for the parties. As a result, the family court found both Husband's and Wife's inheritances were transmuted into marital property.

Wife appeals.

## ISSUES ON APPEAL

1. Did the family court err in relying on the GAL's investigation and report in making its custody determination?
2. Did the family court deprive Wife of her due process rights by considering the GAL's report when the GAL failed to timely submit his report as required by section 63–3–830(A)(6)?
3. Did the family court err in finding Wife's inheritance was transmuted into marital property?

## STANDARD OF REVIEW

"In appeals from the family court, [appellate courts] review[ ] factual and legal issues de novo." *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011). "[W]hile retaining the authority to make our own findings of fact, we recognize the superior position of the family court judge in making credibility determinations." *Lewis v. Lewis*, 392 S.C.

381, 392, 709 S.E.2d 650, 655 (2011) (footnote omitted). The burden is upon the appellant to convince the appellate court that the preponderance of the evidence is against the family court's findings. *Id.* "Stated differently, de novo review neither relieves an appellant of demonstrating error nor requires us to ignore the findings of the family court." *Id.* at 388–89, 709 S.E.2d at 654 (italics omitted).

## APPLICABLE LAW

### 1. Custody Determination

Wife raises several grounds as to how the family court erred when it made its custody decision. We address each argument in turn.

In determining a child's best interest in a custody dispute, the family court should consider several factors, including: who has been the primary caretaker; the conduct, attributes, and fitness of the parents; the opinions of third parties, including the guardian ad litem, expert witnesses, and the children; and the age, health, and gender of the children. *Patel v. Patel,* 347 S.C. 281, 285, 555 S.E.2d 386, 388 (2001). A guardian ad litem must

conduct an *independent, balanced, and impartial* investigation to determine the facts relevant to the situation of the child and the family, which should include: reviewing relevant documents; meeting with and observing the child in the home setting and considering the child's wishes, if appropriate; and interviewing parents, caregivers, and others with knowledge relevant to the case[.]

*Id.* at 288, 555 S.E.2d at 390 (emphasis in original); *see also* S.C.Code Ann. § 63–3–830(A) (2010). "Rather than merely adopting the recommendation of the guardian, the court, by its own review of all the evidence, should consider the character, fitness, attitude, and inclinations on the part of each parent as they impact the child as well as all psychological, physical, environmental, spiritual, educational, medical, family, emotional and recreational aspects of the child's life." *Pirayesh v. Pirayesh,* 359 S.C. 284, 296, 596 S.E.2d 505, 512 (Ct.App.2004). When determining custody, the family court should consider all the circumstances of the particular case and all relevant factors must be taken into consideration. *Id.*

█ Wife first takes issue with the GAL's concern about the parties' differing discipline styles and the potential for Wife to experience another "episode," which the GAL improperly concluded could place Child in danger.

Regarding the discipline issue, we find no improper recommendation by the GAL or ensuing improper reliance by the family court. The GAL couched his concern over how Child was disciplined as it related to both parents' discipline styles.

Specifically, the GAL testified one of his main concerns when parents divorced was

> the rules that the child is required to follow be the same in both homes in that the discipline administered for not following the rules or improper behavior be the same in both homes. And the only way that happens is that both parents have to agree to communicate with each other and set those boundaries....

We find the GAL properly expressed his concerns to the family court based on his observations. Further, Wife fails to highlight—and we fail to find—any reference to or criticism of either party's discipline style in the family court's final order. As a result, we find this argument without merit.

█ Regarding the GAL's concern over Wife's prior mental "episode" in 2008, we find the GAL did not overly emphasize this incident to the family court. We believe it was incumbent upon the GAL to bring this situation to the family court's attention as any relapse could affect Child's wellbeing. Further, the GAL did not testify that Wife was *likely* to experience another episode or that Wife *was* a threat to Child. Rather, the GAL stated his only concern was *if* another episode happened, it could *possibly* put Child in danger. Moreover, the GAL accurately stated in the report that it was only a "single episode" and included Wife's statement that there were no other episodes and it did not affect her ability to parent Child. As such, we find no basis for Wife's allegation that the GAL was biased or attempted to improperly influence the family court in his report.

Additionally, Wife claims the GAL failed to properly investigate certain incidents that occurred while Child was in Husband's care.

The GAL specifically testified at the final hearing that he was aware of certain concerns raised by Wife, including a report that Child was thrown off the back of a jet ski while with Husband. The GAL questioned Child in response to Wife's concern and stated Child told him that she never fell off a jet ski when she was with Husband. The GAL admitted he did not inquire into whether Husband permitted Child to drive a golf cart. However, Wife never introduced any witnesses at the final hearing to substantiate her claim that Husband permitted Child to drive a golf cart or that Husband put Child in danger. As such, we are not persuaded that this alleged occurrence would have affected the GAL's report.

Last, Wife claims the GAL did not conduct a balanced investigation because he only met with Wife one time, the evening after the trial started.

The GAL's report, which was submitted to the family court, reflected that the GAL only conducted telephone interviews with Husband. When asked why the GAL did not speak to Wife prior to the final hearing, the GAL stated that he called the number Wife provided to him several times, but she never answered, and he was unable to leave a message because her voicemail was always full. In addition to the telephone interviews, the GAL conducted a home visit and had private conversations with Husband and Child in Husband's home prior to the final hearing. *See Patel*, 347 S.C. at 288, 555 S.E.2d at 390 (finding GAL should meet with and observe child in the home setting, consider the child's wishes, if appropriate, and interview the parents and others with relevant knowledge of the case). The GAL also met with Wife and Child in Wife's home, but he did not conduct this interview until the evening after the first day of trial. When questioned as to why the GAL did not meet with Wife until the first day of trial, the GAL testified that aside from Wife's failure to return his phone calls, he believed his observations would be more accurate closer to the final hearing. Further, the GAL believed it would be less costly for the parties if he did not have to reinterview them should the family court grant a continuance. We find that despite the GAL's well-intended approach, his investigation with Wife causes concern.

Regardless of these concerns, we find the family court made an independent and well-informed decision, giving appropriate and fair weight to all relevant custody considerations. We first note Wife never objected to the sufficiency of the GAL's investigation at the final hearing. She never attempted to request a continuance or sought to remove the GAL, despite knowing the GAL had not contacted her until the eve of the final hearing. *See Spreeuw v. Barker*, 385 S.C. 45, 70–71, 682 S.E.2d 843, 856 (Ct.App.2009) (finding the father's argument regarding guardian ad litem's bias was not preserved for appeal when the father never made a motion to relieve the guardian based on her bias or otherwise objected to her report at the final hearing); *Payne v. Payne*, 382 S.C. 62, 70, 674 S.E.2d 515, 519 (Ct.App.2009) (finding the mother failed to preserve issue relating to the guardian ad litem's custody recommendation by not objecting when the guardian gave her recommendation to the family court). Other than failing to inquire about the golf cart incident, Wife failed to raise any other specific matters or issues that the GAL failed to investigate. In addition, it appears that the Wife's failure to cooperate with the GAL by not returning phone calls and failing to communicate with the GAL contributed to the tardiness of the GAL's interview as well as his observations of Wife and Child.

Further, the family court was presented with other credible evidence and testimony to support its custody decision, specifically testimony from Dr. Goldsmith, who interviewed both parties and Child, and from other witnesses, who gave Husband "high marks." The family court's final order also lends support for our conclusion. The final order neither referenced the GAL's findings nor stated the family court placed any reliance on the GAL's report or investigation. *Cf. Patel*, 347 S.C. at 286, 555 S.E.2d at 389 (finding family court improperly relied on GAL's biased investigation when the family court explicitly held in its order that "it placed 'a great deal of reliance' on the GAL's report when deciding the custody issue"). Last, although Wife argues otherwise, we cannot conclude the GAL's observations were biased or reflected overwhelmingly favorable treatment towards Husband as the GAL specifically found in his report that both Wife and Husband had close relationships with Child, demonstrated appropriate child rearing skills in their respective homes, and

expressed a genuine concern for Child's best interests. *Cf.
id.*, 347 S.C. at 286, 555 S.E.2d at 388–89 (finding GAL did not
conduct an objective, balanced investigation when GAL's
method of evaluating mother created a high likelihood of bias
in father's favor). Based on the foregoing, the family court
properly considered all the relevant factors and circumstances
of this case when it awarded custody of Child to Husband.

## 2. Due Process

■ Next, Wife contends her due process rights were vio-
lated because the GAL's report did not comply with the notice
requirements of section 63-3-830(A)(6). In response, Hus-
band states Wife never raised the timeliness issue to the
family court when the GAL submitted his report. We agree
with Husband and find this issue unpreserved.

To be preserved, an issue must have been raised to and
ruled upon by the family court. *Payne,* 382 S.C. at 70, 674
S.E.2d at 519. "Issues not raised and ruled upon in the
[family] court will not be considered on appeal." *Id.* Further-
more, a due process claim cannot be raised for the first time
on appeal. *See Bakala v. Bakala,* 352 S.C. 612, 625, 576
S.E.2d 156, 163 (2003).

Because Wife did not object when the GAL submitted his
report and testified before the family court, we find this issue
is unpreserved for our review. *See Payne,* 382 S.C. at 70, 674
S.E.2d at 519 (finding mother failed to preserve issue relating
to guardian ad litem's custody recommendation by not object-
ing when the guardian gave her recommendation to the family
court).

## 3. Transmutation of Wife's Inheritance

Next, Wife claims the family court erred when it found her
inheritance was transmuted into marital property. We dis-
agree.

"Identification of marital property is controlled by the provi-
sions of the Equitable Apportionment of Marital Property
Act" (the Act). *Johnson v. Johnson,* 296 S.C. 289, 294, 372
S.E.2d 107, 110 (Ct.App.1988). The Act defines marital prop-
erty as all real and personal property acquired by the parties
during the marriage that is owned as of the date of filing or

commencement of marital litigation, regardless of how legal title is held. S.C.Code Ann. § 20–3–630(A) (2014). Under the Act, "property acquired by either party by inheritance, devise, bequest, or gift from a party other than the spouse" is nonmarital property. § 20–3–630(A)(1).

 "The spouse claiming an equitable interest in property upon dissolution of the marriage has the burden of proving the property is part of the marital estate." *Johnson,* 296 S.C. at 294, 372 S.E.2d at 110. If a spouse carries this burden, a prima facie case is established that the property is marital property. *Id.* If the opposing spouse then wishes to claim that the property is not part of the marital estate, that spouse has the burden of presenting evidence to establish its nonmarital character. *Id.* (citing *Miller v. Miller,* 293 S.C. 69, 71 n. 2, 358 S.E.2d 710, 711 n. 2 (1987)). If the opposing spouse can show that the property was acquired before the marriage or falls within a statutory exception, this rebuts the prima facie case for its inclusion in the marital estate. *Johnson,* 296 S.C. at 295, 372 S.E.2d at 110.

 "Property that is nonmarital when acquired may be transmuted into marital property if it becomes so commingled with marital property that it is no longer traceable, is titled jointly, or is used by the parties in support of the marriage or in some other way that establishes the parties' intent to make it marital property." *Wilburn v. Wilburn,* 403 S.C. 372, 384, 743 S.E.2d 734, 740 (2013). "Transmutation is a matter of intent to be gleaned from the facts of each case." *Jenkins v. Jenkins,* 345 S.C. 88, 98, 545 S.E.2d 531, 537 (Ct.App.2001). Evidence of intent to transmute nonmarital property may include using the property exclusively for marital purposes or using marital funds to build equity in the property. *Johnson,* 296 S.C. at 295, 372 S.E.2d at 111. However, "[t]he mere use of separate property to support the marriage, without some additional evidence of intent to treat it as property of the marriage, is not sufficient to establish transmutation." *Id.* at 295–96, 372 S.E.2d at 111.

 We agree with the family court's conclusion that Wife's inheritance was marital property. Wife testified the inheritance was deposited into her "separate account" and it was titled jointly only for "emergency" purposes. Husband,

on the other hand, testified the parties deposited Wife's inheritance into a joint account with the intention that the money would be the parties' nest egg. Because it was their nest egg, Husband stated the parties agreed to only use that account when they needed additional money to pay household bills. Having heard both parties' testimony about the nature of their inheritance, the family court found Wife's testimony was not credible. Aware of our broad scope of review, we find the family court was in the best position to weigh each party's testimony on this issue. *See Lewis*, 392 S.C. at 386, 709 S.E.2d at 652 (acknowledging this court's broad scope of review does not alter the fact that a family court is better able to make credibility determinations because it has the opportunity to observe the witnesses); *see also Kennedy v. Kennedy*, 389 S.C. 494, 503, 699 S.E.2d 184, 188 (Ct.App.2010) (finding dispute between parties over whether certain debt was marital or nonmarital was best resolved by family court because it was in a better position to observe the witnesses and assess their credibility).

In addition to the family court's credibility determination, we conclude the parties' actions during their marriage demonstrate they intended the inheritance to be marital property. First, the account was titled in both parties' names. *See Myers v. Myers*, 391 S.C. 308, 319, 705 S.E.2d 86, 92 (Ct.App. 2011) ("The nonmarital character of inherited property may be lost if the property . . . is utilized by the parties in support of the marriage[ ] or is titled jointly or otherwise utilized in such manner as to evidence an intent by the parties to make it marital property.") (internal quotation marks omitted). Second, despite the parties' agreement to only use the account for "emergencies," Husband testified they would occasionally use the account to pay household bills or to cover family expenses if they did not have sufficient funds in their other bank account. In our opinion, the parties' use of Wife's inheritance to pay household bills and family expenses demonstrates these funds were used in support of the marriage. *See Peterkin v. Peterkin*, 293 S.C. 311, 312–13, 360 S.E.2d 311, 312–13 (1987) (finding husband's life estate in family farm was transmuted into marital property because income generated by property was used to pay family expenses); *Sanders v. Sanders*, 396 S.C. 410, 416, 722 S.E.2d 15, 18 (Ct.App.2011) (finding inherit-

ed funds used for household expenses and other purposes "in support of the marriage" to be transmuted into marital property). Further, it is reasonable to conclude Wife's testimony that these funds would be used for emergency purposes implies these funds would be for the benefit of both parties. Third, despite Wife's contention that it was her separate account, she transferred all of the disputed funds into a new account titled in her and her parents' names after the parties filed for divorce. If Wife already considered the funds in this account to be her separate property, we fail to understand the necessity of transferring these funds to a new account. *See Crossland v. Crossland*, 397 S.C. 406, 415, 725 S.E.2d 509, 514 (Ct.App.2012) (finding the husband's premarital savings were transmuted into marital property when the husband added the wife's name to the account shortly after marriage and then transferred the funds into an account solely titled in his name after they separated).

Finally, we believe equity dictates this result. *See Simpson v. Simpson*, 404 S.C. 563, 579, 746 S.E.2d 54, 63 (Ct.App.2013) (citing *Ex Parte Dibble*, 279 S.C. 592, 595, 310 S.E.2d 440, 442 (Ct.App.1983)) (stating the time honored equitable maxim that all courts have the inherent power to all things reasonably necessary to ensure that just results are reached to the fullest extent possible). Both parties testified they received a similarly-valued inheritance. The parties used the entirety of Husband's inheritance to build their marital home. Wife's inheritance, however, was set aside and used only for emergencies, such as when Wife was unemployed, with the mutual intent that it would be their "nest egg." To deprive Husband of his share in this asset when Wife has benefitted from the use of Husband's inheritance is unjust. Therefore, for all the foregoing reasons, we affirm the family court's finding on this issue.

## CONCLUSION

Based on the foregoing, the family court's decision is **AFFIRMED.**

FEW, CJ., and THOMAS, J., concur.