# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Jennifer Lauren Greene, Appellant,

v.

Zachary Daniel Greene, Respondent.

Appellate Case No. 2019-001747

———————

Appeal From Greenville County
Katherine H. Tiffany, Family Court Judge

———————

Opinion No. 5983
Heard March 22, 2023 – Filed April 26, 2023

———————

## AFFIRMED AS MODIFIED AND REMANDED

———————

Vanessa Hartman Kormylo, of Vanessa Hartman
Kormylo, P.A., and Scarlet Bell Moore, of Scarlet Moore
Law, both of Greenville, for Appellant.

Kimberly Fisher Dunham, of Kimberly Dunham,
Attorney at Law, of Greenville, for Respondent.

———————

**MCDONALD, J.:** Jennifer Lauren Greene (Mother) appeals the family court's order awarding joint custody of the parties' young daughter (Child). She further challenges the family court's grant of primary decision-making authority for Child's education and health care needs to Zachary Daniel Greene (Father), as well as the court's award of the annual dependent tax deduction, child support, and attorney's fees. We affirm as modified and remand the fee award to the family court for consideration in accordance with this opinion.

**Facts and Procedural History**

Mother and Father were married in Anderson County in 2011.  The couple have one child, a daughter born in August 2013.  Mother and Father separated on July 23, 2017; the following day, Mother filed a complaint seeking, *inter alia*, an order of separate support and maintenance, custody, child support, equitable division of marital property, and attorney's fees.

Prior to the initial temporary hearing, the parties notified the family court that they had reached an agreement and sought to submit a consent order; however, the parties were unable to agree on Father's visitation.

On September 4, 2017, Mother contacted the South Carolina Department of Social Services (DSS) and the Travelers Rest Police Department (TRPD) to report Child had made a statement about Father touching her "tickle spot," which Mother claimed Child identified by pointing to her clitoris.  On September 15, 2017, Mother filed an amended complaint and motion for pendente lite relief seeking rehabilitative alimony and suspension of Father's visitation.

Following Mother's reporting, Child participated in a forensic interview at the Julie Valentine Center (JVC) in Greenville.  During this interview, Child "easily engaged" with the interviewer but did not disclose abuse and "denied any [inappropriate] touches by nanna, mommy or daddy."  Later that day, Mother asked Father to consent to a second opinion, and Father agreed (through counsel) to a joint private forensic evaluation with licensed professional counselor Cindy Stichnoth.  Father further agreed the parties would split these costs, and his attorney asked that Stichnoth also examine any parental alienation issues.  Around this same time, Mother began attending support group sessions at JVC, and Child began therapy with licensed independent social worker Sarah Davis.

On September 26, 2017, Mother filed an amended motion for pendente lite relief requesting that Father complete a psychosexual evaluation, turn over his electronic devices for review, and execute a medical disclosure authorization.  On November 13, 2017, Stichnoth submitted an interim report recommending both parents submit to "psychological evaluations to assess parenting capacity" and "possible emotional instability."  She also suggested that since Child had been "separated from her father for more than sixty days, placing her at higher risk of possible alienation or estrangement . . . [Child] may benefit from a clarification session with father in order to resume visitation with smooth transition."

One week later, DSS found "[t]he investigation/assessment did not produce a preponderance of the evidence that the child is an abused or neglected child." The TRPD likewise declined to file charges and closed its file.

On January 24, 2018, Dr. Mary Fran Croswell began a forensic medical evaluation but was unable to complete Child's physical examination due to the presence of labial adhesions.[1] Dr. Croswell advised Mother to return with Child for further evaluation once the adhesions resolved.[2] In talking with Dr. Croswell, Child, again, did not disclose abuse.

Following a January 30, 2018 temporary hearing, the family court awarded temporary custody to Mother and visitation to Father every other Saturday and Sunday. The court ordered Father's visitation be supervised in sight and sound by Father's father[3] or another adult approved by the guardian ad litem (GAL). The court further ordered Father to submit to a psychosexual evaluation, pay monthly child support of $692, and participate in discovery "including but not limited to a request to review one another's current devices."

A few months later, during a March 1, 2018 therapy session with Davis, Child stated Father "tickled" her vagina.[4] Child told Davis "she was three years old

---

[1] According to Dr. Croswell, "[l]abial adhesions are adherence of two layers of tissue of the female genital area." The labia minora become adhesed together, "obscuring the underlying structures."

[2] Dr. Croswell testified labial adhesions are "very common" in young girls through age six due to low estrogen levels, "[u]sually secondary to some sort of inflammation or irritation in the area." Upon further questioning, Dr. Croswell agreed she had "seen labial adhesions in patients who have been sexually abused" but noted urine (through exposure to a wet diaper) and fragrant soaps are common causes of such irritation and adhesions.

[3] In her appellate brief, Mother claimed there is no evidence in the record that Child is close with her paternal grandfather or that Child had any relationships with Father's family prior to these supervised visits. At trial, however, Mother testified Child has relationships with Father's mother, father, brother, sister-in-law, sister, and niece and noted these family members had the opportunity to interact with Child throughout the family court litigation.

[4] Child subsequently disclosed to multiple other people.

when this happened and it happened in the living room at their old house when she was naked."  Following this report, Davis contacted TRPD and DSS.  Although DSS opened a new investigation, TRPD did not.

Mother did not appear for Father's March 3, 2018 supervised visitation.  Because Father believed Mother had blocked his number, Father asked his father to text her to see if she was still coming—Mother did not respond.

Around this same time, licensed clinical psychologist James Ruffing conducted a psychosexual evaluation of Father.  Dr. Ruffing completed his initial report on March 8, 2018, finding, "There does not appear to be a propensity for sexual maladjustment or sexual impulsivity and the test results did not reflect unpredictability or peculiarity in thought and action, particularly in the sexual area."  After reviewing Dr. Ruffing's report, the GAL emailed the parties' counsel, noting the report indicated Father "has no issues concerning abuse of children."[5]  The GAL then recommended Father have unsupervised standard visitation.

On April 2, 2018, the family court entered a supplemental consent order changing Child's therapist from Sara Davis to licensed professional counselor Meredith Thompson-Loftis; the parties further agreed to equally divide Child's therapy costs.

On April 9, 2018, during a second forensic interview at JVC, Child disclosed Father had tickled her vagina.  The following exchange took place:

> [Interviewer]: You don't remember.  But you were in the bath and then—then what happened?
>
> [Child]: I told her everything in the bath.
>
> [Interviewer]: You told her everything in the bath?
>
> [Child]: I don't really want to do this.  I want to see my mom and told—told her I did—I told you.

---

[5] Mother later sought to submit collateral information purportedly related to the evaluation.  Thus, pursuant to instructions in a supplemental temporary order, Dr. Ruffing issued a supplemental report, noting his "examination of the documents [specifically, Father's journal from the early 2000s] would not alter or change the psychological findings and the professional opinion" provided in his initial report.

[Interviewer]: You want to tell your mom that you told me?

[Child]: Yeah.

[Interviewer]: Well has anybody told you what to tell me or what to say to me today?

[Child]: No. But only my mom told me—told me that I had to tell you this.

[Interviewer]: She told you that—that you had to tell me this? How come she wanted me to tell you that?

[Child]: It [sic] because it [sic] important.

[Interviewer]: Because it's important. And how do you know that it's important?

[Child]: I'm [sic] just know.

Licensed clinical psychologist Luther Diehl completed a psychological evaluation of Mother on April 26, 2018. Dr. Diehl determined Mother has "adequate psychological resources to function in the role of a custodial parent." His diagnostic impression of Mother included passive aggressive personality traits but no specific categorization of parental alienation. However, Dr. Diehl specifically noted "it is difficult to establish alienating dynamics by evaluating one individual in a family system. In this case, it does not appear that [Mother] is markedly angry and hostile toward her estranged husband, but does have negative feelings because of what she has reportedly heard from her daughter." Diehl opined Mother "did not present a markedly negativistic statement regarding a belief that [Father] should not ever have any further visits with [Child, but she] did present some indications of some conflict in terms of her opinion about what should take place."

On May 8, 2018, the GAL filed an additional motion for temporary relief. Following a hearing, the family court removed the supervision requirement for Father's visitation. In its supplemental temporary order, the family court also noted

the parties were free to supplement the information provided to Dr. Ruffing and Dr. Diehl for purposes of their respective psychological evaluations of the parties.[6]

On June 20, 2018, TRPD reopened its investigation after receiving a copy of the DVD of Child's second forensic interview and reviewing additional affidavits provided by Mother. However, after considering Father's polygraph results, conducting further investigation, and consulting with a local magistrate, the TRPD investigator determined "there is no probable cause to believe that there was any sexual activity between [Father] and [Child]. This case is unfounded."[7]

On October 8, 2018, Father filed a motion for temporary relief, seeking a holiday visitation schedule and division of the proceeds from the sale of the marital home. The motion further noted:

> The Guardian ad Litem has requested that the minor child
> not wear the Gizmo watch to visitation with her Father.
> The Gizmo watch allows the Mother to hear
> conversations going on in the Father's residence during
> periods when he has visitation and to GPS track the
> minor child. Mother has refused not to send the watch.

Two days later, Mother filed a motion to remove the GAL. At the November 15, 2018 hearing addressing these matters, Thompson-Loftis provided an affidavit stating she saw no clinical reason why Father's visitation with Child should not be expanded. The family court subsequently awarded Father holiday visitation, enjoined and restrained the parties from posting anything about the case or the opposing party on social media,[8] denied Mother's motion to remove the GAL, and

---

[6] At trial, Father expressed concerns that Mother was "less than candid" with Dr. Diehl for purposes of her own psychological evaluation. However, Father admitted he failed to provide Dr. Diehl with additional information regarding the omissions in his report, including but not limited to the fact that Mother was still breastfeeding Child—then four years old—at the time of Dr. Diehl's inquiry.

[7] Polygraph reports provided to Dr. Diehl prior to his evaluation of Mother indicated Father "was not being deceptive about inappropriate touching of his daughter."

[8] Mother posted numerous Facebook entries directly and indirectly addressing the divorce and sexual abuse allegation.

raised the GAL's fee cap.  The court declined Father's request for an order enjoining Mother from sending the Gizmo watch with Child for Father's visitation but noted nothing prevented Father "from taking it off as the parent with physical placement" of Child.  Following this hearing, Mother cancelled Child's scheduled counseling appointment with Thompson-Loftis.

The Honorable Katherine Tiffany presided over the final merits hearing from February 11 through February 15, 2019, and on July 8, 2019.  Because the matter could not be completed during the week allotted, the court issued an interim order raising the GAL's fee cap and granting Father visitation pursuant to "Judge Brown's Standard Visitation Schedule."  This schedule, which Judge Tiffany helpfully attached with her order, essentially provides the non-custodial parent alternating weekends with a Thursday night early dinner visit during the week the custodial parent has the weekend.  Notably, the family court ordered Child "shall immediately resume weekly counseling with Meredith Thompson-Loftis."

In addition to testifying about Child's alleged disclosures, Mother explained that when Child was an infant, she observed Father bathing Child's genitalia with his bare hands.  Mother also stated that when Child was two or three, she noticed Father bathing Child's genitalia with his finger, prompting Mother to tell him Child could wash herself.  While Father denies any misconduct, he does not dispute that he has bathed Child without a washcloth in the past.  Father further testified Child is "fairly reliable and fairly responsible" for her age and "doesn't tend to be deceitful on a regular basis."

The parties presented various experts addressing the parental dynamic and Child's purported disclosures.  Regarding Father's psychosexual evaluation, Dr. Selma Watson, Mother's expert in clinical and forensic psychology, testified she would have utilized a penile plethysmograph (PPG) and Limestone Visual Preference Test, interviewed both parents, and considered as many sources of information as possible had she evaluated Father.  Dr. Watson further critiqued Dr. Ruffing's approach to Father's evaluation as more appropriate for a civil commitment proceeding than a family court matter.[9]

Counselor Stichnoth also testified and provided an affidavit stating,

---

[9] Dr. Ruffing testified a PPG was unnecessary because he did not find "any markers that raised concern for me with [Father]."

There is no evidence presented to indicate [Child] has experienced sexual abuse or is at risk of sexual abuse by her father. While I believe that [Child] did make a statement about "my tickle spot" to her mother during a bath on September 4, 2017, I am aware of a multitude of factors related to timing of events, level of parental distress, and dynamics of this enmeshed family system which impact my interpretation of that statement and basis for [Mother's] resulting misbelief that [Child] spontaneously disclosed sexual abuse by her father. My interpretation is also highly informed by the stark contrast between [Mother's] detailed account of this 'disclosure' and [Child's] presentation in the first forensic interview. The most significant difference between the first forensic interview (no disclosure) and the second forensic interview (problematic disclosure) is [Child's] method of providing information. In the first interview, [Child] demonstrated understanding of questions and responded in detail, was unsure why her parents no longer lived together, and verbalized healthy attachments and experiences with healthy touching equally among her mother and father, but did not demonstrate a need to confirm details of her mother's report that [Child] disclosed her father had touched her inappropriately. In the second interview, after six months of counseling and maternal behavior directed toward enabling disclosure, before the interviewer could complete [the] rapport portion and begin [the] interview portion, [Child] volunteered "I have something to tell you . . . so, my dad tickled my vagina once . . . my dad don't live with us because [of] that." After [the] interviewer completed [the] rapport portion and focused on inquiries for details, [Child] provided minimal responses peppered with "I don't know . . . I don't remember." . . . [Child] went on to deny experience of healthy touches/tickles with her mother and denied being ticklish, in stark contrast to her demonstrated enjoyment of being ticklish on feet, hands, and armpits during [her] first interview. When asked where she initially made the disclosure to her mother, [Child] stated "bedroom . . . actually the

bathroom . . . and I was taking a bath." When [the] interviewer prompted her to tell more about that event, [Child] responded "I don't remember . . . I told her everything in the bath . . . I don't really want to do this . . . I want to see my mom and told, told her I did, I told you." When [the] interviewer asked if anyone told [Child] what to say to her, she responded "No, but only my mom told me, told me that I had to tell you this." [Child] went on to answer mom wanted her to tell "because it's important" and how she knew it was important "I just know." In my opinion, counseling services and maternal behavior, advocating for the protection of a child believed to be a victim at risk of further abuse, has collectively served to skew [Child's] true experience of her parents, while instilling belief that she is responsible for her parent[s'] divorce and reinforcing existing enmeshment with her mother. Additionally, the outcome of [the] second interview has reinforced [Mother's] misbelief that she must continue to disparage and reject [Father] in order to protect [Child].

After completing the merits hearing, the family court awarded Mother and Father joint custody, with Father to have primary decision-making authority for Child's education and health care, and Mother to have primary decision-making authority for her extracurricular activities and religious training. The court ordered Mother, Father, and Child to attend individual counseling, and ordered Mother and Father to engage in counseling to address co-parenting. The court awarded Mother child support in the amount of $78 per month and Father the yearly dependent tax deduction. The family court further awarded Father $35,000 in attorney's fees, but permitted Mother to partially satisfy this fee obligation by foregoing receipt of her equitable share of Father's 401(k) (amounting to $11,138.40) as partial payment.

Neither Mother nor Father moved to reconsider, but both timely appealed. Father subsequently withdrew his cross-appeal.

**Standard of Review**

"Appellate courts review family court matters de novo, with the exceptions of evidentiary and procedural rulings." *Stone v. Thompson*, 428 S.C. 79, 91, 833 S.E.2d 266, 272 (2019); *Stoney v. Stoney*, 422 S.C. 593, 595 n.2, 813 S.E.2d 486,

487 n.2 (2018) (noting an abuse of discretion standard is to be used for reviewing a family court's evidentiary or procedural rulings).  While this broad scope of review allows the appellate court to find facts in accordance with its own view of the preponderance of the evidence, it does not require this court to disregard the findings of the family court.  *Lewis v. Lewis*, 392 S.C. 381, 384, 709 S.E.2d 650, 651 (2011).  The appellant bears the burden of convincing the appellate court that the family court committed error or the preponderance of the evidence is against the family court's findings.  *Id*. at 392, 709 S.E.2d at 655.

**Law and Analysis**

## I.  Joint Custody and Decision-Making Authority

Mother argues the family court erred in awarding joint custody and in granting Father primary decision-making authority for Child's education and health care needs.  We disagree.

The family court has exclusive jurisdiction "to order joint or divided custody where the court finds it is in the best interests of the child."  S.C. Code Ann. § 63-3-530(A)(42) (Supp. 2022).  Section 63-15-230 of the South Carolina Code (Supp. 2022) mandates the following regarding a final custody determination:

> (A) The court shall make the final custody determination in the best interest of the child based upon the evidence presented.
>
> (B) The court may award joint custody to both parents or sole custody to either parent.
>
> (C) If custody is contested or if either parent seeks an award of joint custody, the court shall consider all custody options, including, but not limited to, joint custody, and, in its final order, the court shall state its determination as to custody and shall state its reasoning for that decision.
>
> (D) Notwithstanding the custody determination, the court may allocate parenting time in the best interest of the child.

In considering custody, the best interest of the child is "the primary, paramount, and controlling consideration." *Klein v. Barrett*, 427 S.C. 74, 80, 828 S.E.2d 773, 776 (Ct. App. 2019) (quoting *McComb v. Conard*, 394 S.C. 416, 422, 715 S.E.2d 662, 665 (Ct. App. 2011)). "In determining a child's best interest in a custody dispute, the family court should consider several factors, including: who has been the primary caretaker; the conduct, attributes, and fitness of the parents; the opinions of third parties, including the guardian ad litem, expert witnesses, and the children; and the age, health, and gender of the children." *Simcox-Adams v. Adams*, 408 S.C. 252, 260, 758 S.E.2d 206, 210 (Ct. App. 2014). "While numerous prior decisions set forth criteria that are helpful in such a determination, there exist no hard and fast rules and the totality of circumstances peculiar to each case constitutes the only scale upon which the ultimate decision can be weighed." *Clark v. Clark*, 423 S.C. 596, 605, 815 S.E.2d 772, 777 (Ct. App. 2018) (quoting *Davenport v. Davenport*, 265 S.C. 524, 527, 220 S.E.2d 228, 230 (1975)).

"Although the legislature gives family court judges the authority 'to order joint or divided custody where the court finds it is in the best interests of the child'" our supreme court has concluded that "joint or divided custody should only be awarded where there are exceptional circumstances." *Lewis*, 400 S.C. at 365, 734 S.E.2d at 327 (quoting *Patel v. Patel*, 359 S.C. 515, 528, 599 S.E.2d 114, 121 (2004) (*Patel II*)); *see also Mixson v. Mixson,* 253 S.C. 436, 446, 171 S.E.2d 581, 586 (1969) (finding "[d]ivided custody is usually harmful to and not conducive to the best interest and welfare of the children"); and *Scott v. Scott*, 354 S.C. 118, 125, 579 S.E.2d 620, 623-24 (2003) (opining "section 20–7–420(42) did not change the law in this State that, generally, joint custody is disfavored.").[10]

Here, Child purportedly made a sexual abuse disclosure to Mother, and Stichnoth acknowledged she believes Child made some statement to Mother regarding her "tickle spot."[11] However, DSS issued two separate notices of unfounded

---

[10] We continue to express concern about our appellate joint custody jurisprudence, specifically the language the supreme court incorporated from *Mixson*, *supra*, a 1969 case, after the General Assembly amended the statute to include joint custody as an option for family courts to consider. As we noted in *Klein*, *supra*, "The General Assembly imposed no 'exceptional circumstances' requirement in 1996, when it codified joint custody as an option for family courts to consider in a child custody determination." 427 S.C. at 86 n. 9, 828 S.E.2d at 779 n. 9.

[11] Adding to the confusion, Child at times identified "tickle spots" under her arms, on her feet, and on her hand.

investigations/assessments after its investigation did not produce a preponderance of the evidence that Child is an abused or neglected child. TRPD likewise twice declined to file charges and closed its file.

More significantly, the guardian ad litem, Thompson-Loftis, and Stichnoth recommended Father have expanded, unsupervised visitation. And notably, Dr. Ruffing's report states, "There does not appear to be a propensity for sexual maladjustment or sexual impulsivity and the test results did not reflect unpredictability or peculiarity in thought or action, particularly in the sexual area."

Although Thompson-Loftis believed both Mother and Father were capable of handling Child's temperament and meeting her developing needs, she testified, "I think there is a huge disconnect between the two of them. If you're talking about a custody situation where there's a split custody, in my opinion, those are some of the worst ones because of the fact that the parents don't communicate." Thompson-Loftis stated, "And that is—that is very—that has been evident in all of my work with [Child], and that's something that I think [Child] struggles with, which is the anxiety that she knows her parents don't talk and they don't get along."

Thompson-Loftis explained that although Father was willing to communicate with Mother, Mother was not willing to communicate with Father; she further noted their communication was strained even before their separation. While Thompson-Loftis believed Father would encourage Child's relationship with Mother, she testified Mother would not be able to encourage a relationship between Child and Father. She described Mother and Child as enmeshed, noting Mother "coddled" Child and "kind of enabled some of the—the attachment and the—the difficulty in separation."

Through her affidavit, Stichnoth opined:

> [Child] is not an alienated child as she demonstrates attachments to both parents, however unhealthy family dynamics and mental health professionals that are not qualified to provide balanced and objective treatment for children in court-related cases have placed [Child] at high risk to become alienated or estranged; without provision of appropriate forensically informed treatment services for [Child] and her parents, she is at high risk for inhibited development and emotional dysfunction such as is currently demonstrated by her parents. In my opinion[,

Child] is best diagnosed …. as [a] Child Affected by Parental Relationship Distress or CAPRD. This diagnosis is defined in the DSM-5 as "negative effects of parental relationship discord (i.e., high levels of conflict, distress, or disparagement) on a child in the family, including effects on a child's mental or other medical disorders."

. . . .

In my opinion both [Father and Mother] care deeply for [Child] and want to provide her with the best chances to be healthy and successful in life; I see no evidence to suggest either of them has intentionally engaged in behavior to harm [Child], however their ability to accept and engage in a treatment plan to improve their own emotional health and parental capacity is paramount to [Child's] future health.

Mother "asked for sole custody of [Child] with visitation, but if ultimately that's what's best for [Child], then I have agreed to joint custody with me having final say of, you know, any matters that are disputed." Mother clarified she and Father should make joint decisions for Child, but she asked to have the final say when the parties could not agree.

With regard to custody and decision-making, Father testified, "In a perfect world, there would be 50/50 joint physical and everything else. I think both of us are capable of that. The reality and given the history and everything else, a standard visitation schedule would be fine. I would love to have her Friday to Monday. On holidays and in the summertime, I think that would be great." However, when directly asked what he wanted, Father replied, "Joint custody. 50/50 split. Week on/week off." Father also noted he would be thrilled with "any visitation."

Considering Child's best interest as the paramount concern, we find the family court properly awarded the parties joint custody. *See e.g.*, *Klein*, 427 S.C. at 80, 828 S.E.2d at 776 ("In a child custody case, the welfare of the child and what is in the child's best interest is the primary, paramount, and controlling consideration of the court." (quoting *McComb*, 394 S.C. at 422, 715 S.E.2d at 665)). Our de novo review of the record reveals that prior to the parties' separation and for

approximately two years afterwards, Mother was Child's primary caretaker.[12] Following the sexual abuse allegation, Father's visitation with Child was extremely limited from September 2017 through August 2019. Mother and Father had virtually no contact from September 2017 through March 2019, when they began communicating through text messages with encouragement from Child's counselor, Thompson-Loftis.

Mother and Father have been rotating Child's placement on a weekly basis without further involvement from the family court, DSS, or law enforcement since August 30, 2019. While Mother indicated at oral argument that the visitation schedule was not working for Child, Father disagreed—and noted neither party has sought a modification based on any change in circumstances. Finally, there is a consensus among knowledgeable third parties, including the GAL and treating experts, that both Mother and Father are fit and loving parents. Thus, we find the circumstances of this case—including but not limited to Child's attachment to both parents, Mother's reactions to recommendations she finds unfavorable, and Mother's potential for unhealthy enmeshment with Child—constitute exceptional circumstances warranting the family court's award of joint custody. *See, e.g.*, *Clark*, 423 S.C. at 608, 815 S.E.2d at 778–79 (finding the passage of time and the good reports on the minor child's welfare and mental adjustment comprise exceptional circumstances warranting joint custody).

We further agree with the family court that Mother and Father should have delineated categories of responsibility for major decisions concerning Child. Despite their many disagreements and differing opinions, Mother and Father seem to mostly agree on Child's schooling, religious education, and pediatrician. To the extent they do not agree, however, the record supports the family court's assignment of the decision-making categories for Child's parenting.

---

[12] Mother stopped working outside the home around the time Child was conceived due to the stress of her job at Verizon Wireless. When Child was an infant, Father took ten to twelve weeks of family leave from his job to be with Mother and Child. In 2015, Mother started a residential cleaning business, which she still ran at the time of the final merits hearing.

## II.    Dependent Tax Deduction

Mother argues the family court erred in awarding Father the annual dependent tax deduction.  We agree with Mother and thus modify the deduction award.

Section 20-3-130(F) of the South Carolina Code (2014) provides "[t]he Family Court may allocate the right to claim dependency exemptions pursuant to the Internal Revenue Code and under corresponding state tax provisions and to require the execution and delivery of all necessary documents and tax filings in connection with the exemption."  *See also Hudson v. Hudson*, 340 S.C. 198, 203, 530 S.E.2d 400, 402–03 (Ct. App. 2000) (noting the custodial parent is generally entitled to claim the deduction under the governing provisions of the Internal Revenue Code).

Because Mother and Father were awarded joint custody, we find it more appropriate to award this deduction to Father and Mother in alternating years. Accordingly, going forward, Father shall claim Child for even years beginning with tax year 2022, and Mother shall claim her for odd years beginning with tax year 2023.  Therefore, we affirm as modified the family court's order as to the dependent tax deduction.

## III.    Child Support

Mother next argues the family court erred in calculating child support.  We disagree.

Mother's only argument addressing the question of child support notes that had the family court awarded Mother sole custody, a proper calculation based on the figures provided by the parties would result in Father's payment to Mother of $609.00 in monthly support.  Thus, it appears Mother has abandoned this issue. *See* Rule 208(b)(1)(D), SCACR (requiring "discussion and citations of authority" for each issue in an appellant's brief); *Broom v. Jennifer J.*, 403 S.C. 96, 115, 742 S.E.2d 382, 391 (2013) (finding an issue abandoned where the party's brief cited only one family court rule and presented no argument as to how the family court's ruling was an abuse of discretion or constituted prejudice).  Yet, even upon consideration of the merits, we would affirm the family court's support analysis because the calculation followed DSS's Child Support Guidelines and properly considered that Father will maintain Child's health insurance through his employment, pay a greater percentage of any uncovered health care expenses Child might incur, and be responsible for work related child care expenses during the school year.

## IV.    Attorney's Fees

Finally, Mother asserts the family court erred in awarding attorney's fees to Father while failing to award fees to her.  We remand the fee award for further consideration as discussed below.

In determining whether to award attorney's fees, the family court considers four factors: "(1) the party's ability to pay his/her own attorney's fee; (2) [the] beneficial results obtained by the attorney; (3) the parties' respective financial conditions; [and] (4) [the] effect of the attorney's fee on each party's standard of living." *E.D.M. v. T.A.M.*, 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992).  "Failing to cooperate and prolonging litigation can serve as an additional ground for awarding attorney's fees." *Daily v. Daily*, 432 S.C. 608, 630, 854 S.E.2d 856, 868 (Ct. App. 2021).  When determining the reasonableness of attorney's fees, the family court considers "(1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) [the] professional standing of counsel; (4) [the] contingency of compensation; (5) [the] beneficial results obtained; [and] (6) [the] customary legal fees for similar services." *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991).  "The family court can also consider a litigant's uncooperative and evasive behavior when determining the reasonableness of the fees." *Daily*, 432 S.C. at 630–31, 854 S.E.2d at 868.

Again, Mother's main argument is that since she should have prevailed at trial on the issues of custody, visitation, child support, the tax credit, and certain restraining orders, the family court should have awarded *her* attorney's fees, not Father.  But Mother did not obtain beneficial results before the family court, and other than adjusting the award of the dependent tax deduction, we have affirmed the majority of the family court's well-reasoned order.  Regarding the parties' respective abilities to pay and financial conditions, Mother testified she has received financial support from her mother in order to purchase a home and to fund her legal fees.  Still, we note the family court's findings that "[b]oth parties earn or have the ability to earn modest incomes, and enjoy modest but not extravagant lifestyles.  Neither can easily afford attorney's fees and costs on their incomes.  But both have access to some resources from which they can pay such fees and costs."  We also appreciate the option given by the family court for Mother to forego a portion of her equitable apportionment—$11,138.50 from Father's 401(k)—as partial payment of her fee obligation.

However, to the extent Mother's fees and costs include monies paid to digital forensic examiner James Boswell and/or attorney's fees expended to address

Father's likely wiping of his devices upon learning he would be required to produce them, we find Father should be responsible for all such fees because he took "significant actions . . . on each of the computer devices that . . . impeded [the digital] investigation."[13]  Additionally, we find Father responsible for any GAL fees related to Boswell, the computer forensic report, and the family court's consideration of discovery related to Father's electronic devices.

Therefore, while we affirm the family court's denial of attorney's fees to Mother, we remand Father's fee award for the family court to calculate the figure to which Mother is entitled as an offset for all fees and costs related to her investigation of Father's actions associated with the production of his electronic devices, including but not limited to the attorney's fees and costs Mother has incurred in addressing Father's discovery behavior before the family court.  Once the parties have provided any necessary supplemental information detailing these specific fees and costs, the family court will be able to calculate the appropriate figure associated with the discovery of Father's electronic devices.  This figure should be added to the $11,138.50 discussed above, further offsetting Mother's attorney's fee obligation to Father, which we affirm other than as modified here.

**Conclusion**

For the foregoing reasons, the family court's decision is

**AFFIRMED AS MODIFIED AND REMANDED.**

**THOMAS and HEWITT, JJ., concur.**

---

[13] Just days after the hearing addressing discovery and production of electronic devices, Father "unintentionally" wiped his computer by installing a Linux operating system.  Boswell testified that between February 1 and March 9, 2018, the day Father turned over his devices to the GAL, "significant actions were taken on each of the computer devices that would have impeded [his] investigation." Boswell further explained this is a "more involved process than just reinstalling an operating system," as Father's actions would have taken approximately one and a half to two hours per device.  Father admitted to the GAL that he deleted "a single photo" of an unclothed woman from his cell phone because, in his opinion, it "wasn't relevant to anything."